JACOB M. HEATH (STATE BAR NO. 238959)
jheath@orrick.com
REBECCA HARLOW (STATE BAR NO. 281931)
rharlow@orrick.com
THOMAS FU (STATE BAR NO. 325209)
tfu@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

Attorneys for Defendant
Planned Parenthood Federation of America, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHIRLEY HINTON and HEATHER SHIPLEY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.,<br><br>Defendant. | Case No. 3:23-cv-04529-JD<br><br>**DEFENDANT PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: January 22, 2026<br>Time: 11:00 a.m.<br>Location: Courtroom 11, 19th Floor<br>Judge: Hon. James Donato |

## TABLE OF CONTENTS

Page

I. BACKGROUND ....... 3
  A. Like Thousands Of Websites, PPFA's Website Uses Analytics Technologies To Provide Information On Visitors' Website Use And Security....... 3
  B. The Specific Technologies At Issue In This Case Either Do Not Collect Personally Identifying Information At All (Google Analytics) Or Do So Only In Limited Circumstances (Meta Pixel)....... 4
  C. Contrary To Their Claims, Plaintiffs Have Adduced No Evidence That Private Information About Their Purported Visits To PPFA's Website Was Transmitted To Google And Meta....... 6
II. LEGAL STANDARD....... 10
III. ARGUMENT....... 11
  A. Plaintiffs Have Not Satisfied The Requirements For Certifying A Class Under Rule 23(a), Because They Are Neither Typical Nor Adequate Class Representatives....... 11
  B. Plaintiffs Do Not Meet The Requirements For Certifying A Class Under Rule 23(b)(3), Because Individualized Questions Predominate....... 13
    1. Showing The Requisite Injury Requires Demonstrating That Meta *Actually* Linked A Person's Website Visit To Their Identity—Not Just That It *Could*—Which Implicates A Host Of Individualized Inquiries. ....... 15
    2. Plaintiffs' Reliance On "Cookies Containing Information Relating To Website Users' Meta Account Identifiers" Implicates Even More Dispositive Individualized Inquiries. ....... 18
    3. Courts Have Already Rejected Plaintiffs' Misleading Contention That They Can Establish Classwide Injury By Showing Meta Can "Identify" Users. ....... 20
  C. Plaintiffs' Cursory Attempt To Certify A Class Under Rule 23(b)(2) Fails....... 22
  D. There Is No Way To Ascertain Membership In Plaintiffs' Proposed Class. ....... 23
IV. CONCLUSION....... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Algarin v. Maybelline, LLC*, 300 F.R.D. 444 (S.D. Cal. 2014) ........ 11, 12

*Ambrosio v. Progressive Preferred Insurance Co.*, 154 F.4th 1107 (9th Cir. 2025)........ 14

*American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013)........ 11

*Bruton v. Gerber Products Co.*, 2018 WL 1009257 (N.D. Cal. 2018)........ 23

*Cahen v. Toyota Motor Corp.*, 717 F. App'x 720 (9th Cir. 2017)........ 17

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)........ 11

*Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117 (S.D. Cal. 2023)........ 17

*Deirmenjian v. Deutsche Bank, A.G.*, 2009 WL 10671426 (C.D. Cal. 2009)........ 24

*Dinerstein v. Google, LLC*, 73 F.4th 502 (7th Cir. 2023)........ 15

*Fine v. ConAgra Foods, Inc.*, 2010 WL 3632469 (C.D. Cal. 2010)........ 11

*Frank v. Gaos*, 586 U.S. 485 (2019)........ 18

*Frasco v. Flo Health, Inc.*, 349 F.R.D. 557 (N.D. Cal. 2025)........ 17

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)........ 11

*Griffith v. TikTok, Inc.*, 2024 WL 4308813 (C.D. Cal. 2024)........ 13, 20, 21

*Heiting v. FKA Distribution Co.*, 2025 WL 736594 (C.D. Cal. 2025)........ 16, 17

*Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015)........ 24

*In re Capacitors Antitrust Litigation*, 2020 WL 6462393 (N.D. Cal. 2020)........ 22

*In re Hulu Privacy Litigation*, 2014 WL 2758598 (N.D. Cal. 2014)........ 19

*In re PFA Insurance Marketing Litigation*, 696 F. Supp. 3d 788 (N.D. Cal. 2021)........ 23

*J.L. v. Cissna*, 2019 WL 415579 (N.D. Cal. 2019)........ 24

*Kishnani v. Royal Caribbean Cruises Ltd.*, 2025 WL 1745726 (N.D. Cal. 2025)........ 17

*Lloyd v. Facebook, Inc.*, 2022 WL 4913347 (N.D. Cal. 2022)........ 21

*Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012)........ 17

*Mikulsky v. Noom, Inc.*, 2024 WL 251171 (S.D. Cal. 2024)........ 17

*Mitchener v. CuriosityStream, Inc.*, 2025 WL 2272413 (N.D. Cal. 2025) .................................... 17

*Mitchener v. Talkspace Network LLC*, 2025 WL 1822801 (C.D. Cal. 2025) ................................ 16

*Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505 (9th Cir. 2023) .................................. 21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022)... 19

*Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025) ............................................................. 14

*Price v. Converse, Inc.*, 2025 WL 3295119 (C.D. Cal. 2025) ...................................................... 17

*Scott v. AT&T Inc.*, 790 F. Supp. 3d 781 (N.D. Cal. 2025) .......................................................... 19

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ................................................................ 14, 17

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) .............................................................. 13

*Walker v. Life Insurance Co. of the Southwest*, 953 F.3d 624 (9th Cir. 2020) ............................... 23

**Statutes**

California Penal Code § 637.2 ......................................................................................... 14

**Other Authorities**

Standing Order for Civil Cases ........................................................................................ 20

Supplemental Brief of the United States, *Frank v. Gaos*, No. 17-961 (filed Nov. 30, 2018).......... 18

**Rules**

Federal Rule of Civil Procedure 23 ......................................................................... 10, 14, 23

**Treatises**

W. Blackstone, Commentaries on the Laws of England ............................................................. 18

Plaintiffs claim that when individuals visited Defendant Planned Parenthood Federation of America, Inc.'s ("PPFA") website at www.plannedparenthood.org, it would transmit personally identifiable information." First Amended Complaint, Dkt. No. 48 ("FAC"), ¶¶ 73, 80.[1] Plaintiffs now seek to represent a class of "[a]ll persons who, between September 1, 2022, and July 6, 2023 [("Class Period")], while in California" used PPFA's website to either search for, or view specific pages providing information about, "abortion, STD testing, birth control, pregnancy testing, hormone therapy or emergency contraception." Motion for Class Certification ("Mot."), Dkt. No. 93, at i. But Plaintiffs' Motion fails to satisfy at least four prerequisites of class certification—including typicality, adequacy, predominance, and ascertainability—because Plaintiffs themselves are not members of the putative class, do not and cannot show injury on a classwide basis, and have no way of determining who is and is not a member of the class they seek to represent.

**Typicality and Adequacy.** Plaintiffs' Motion fails at the threshold. Neither Plaintiff is a member of the putative class, meaning that neither is a typical or adequate class representative. For one thing, Plaintiffs themselves are not even clear that they visited PPFA's website, as opposed to the website of an independent Planned Parenthood local affiliate, and are unable to tell the difference. The only other evidence about their activities refers exclusively to an affiliate and its website—not [redacted]

---

[1] Plaintiffs also made similar allegations as to Google, FAC ¶ 87, but have since admitted that they have no evidence to sustain those allegations, *see* Declaration of Jamie A. Robinson, Dkt. No. 93-7 ("Robinson Decl.") ¶ 16 (noting that Google responded to a Rule 45 subpoena by informing Plaintiffs that it does not have "the requested PPFA website user event data from the class period"—meaning that Plaintiffs have no evidence that Google identified Plaintiffs or any other visitors to PPFA's website). Plaintiffs' allegations vis-a-vis Google are therefore largely irrelevant for purposes of Plaintiffs' motion.

[redacted]

**Predominance.** Plaintiffs' Motion separately fails, because any attempt at class proceedings would immediately devolve into a morass of individualized inquiries into whether each class member actually suffered the privacy injury (identification by Meta) for which this lawsuit seeks to recover. That determination is impossible to make on a classwide basis. As Plaintiffs themselves illustrate, ***Meta did not identify every visitor to PPFA's website***. As a result, if this case were to proceed as a class action, the Court would be forced to assess, for each and every putative class member, whether Meta did, in fact, identify them with their activities on PPFA's website. Indeed, even determining whether Meta was ***capable*** of identifying a particular website visitor would turn on a host of individualized variables, including whether: (1) the visitor had a Facebook account; (2) the visitor was signed into Facebook when they visited PPFA's website; (3) the visitor used the same device and browser to sign into Facebook and visit PPFA's website; and (4) the visitor's browser blocked third-party cookies, either because it did so by default (as, *e.g.*, Safari does), or because the visitor actively configured it to do so (via, *e.g.*, Firefox's Facebook Container or Chrome's Google Analytics Opt-Out). And determining whether Meta actually exercised that capability for a given user will require further individualized inquiries still.

**Ascertainability.** Plaintiffs' Motion separately flounders, because Plaintiffs admit they cannot ascertain who is in their proposed class and who is not. Instead, they suggest that they ***might*** be able to ascertain class membership in the future, if—months after the close of discovery—this Court compels Meta to (1) take steps to identify every visitor to PPFA's website that it can; and (2) produce that information to Plaintiffs. That belated request for a unilateral extension of discovery is not just wildly improper—and indeed, already rejected by this Court as "a day late and a dollar short" Ex. 1[2] at 9:24-10:2, but also exceptionally perverse, as it would force Meta to cause exactly the privacy injury that Plaintiffs complain about in their lawsuit—*i.e.*, identifying individuals with their

[2]All exhibit references herein shall refer to exhibits to the Declaration of Jacob M. Heath filed concurrently with this Opposition.

activities on PPFA's website. Plaintiffs' bizarre proposal confirms that this case is incapable of classwide resolution.

This case cannot proceed on classwide basis for multiple reasons, and the Court should deny Plaintiffs' request for class certification.

## I. BACKGROUND

### A. Like Thousands Of Websites, PPFA's Website Uses Analytics Technologies To Provide Information On Visitors' Website Use And Security.

PPFA is a 501(c)(3) nonprofit corporation and membership organization. PPFA has 47 members, each of which is an independently incorporated and operated non-profit health care provider. *See* Ex. 3 at 1; *see also* Ex. 2 at 17-20. PPFA does not itself provide health care services. Instead, it provides a variety of support services to its local member affiliates, who collectively operate approximately 550 separate health centers across the country, which provide healthcare to more than 2 million people each year. Ex. 4 at 1; Ex. 3 at 1. PPFA's work in support of sexual and reproductive health care includes operating an informational website at www.plannedparenthood.org, where it posts information about various health-related topics. Ex. 5 at 1-2. PPFA's website—*i.e.*, "www.plannedparenthood.org and its related webpages … wholly owned and operated by [PPFA]," (the "Website") FAC ¶ 2—is distinct from websites associated with the affiliates and their health centers, which (unlike PPFA's Website) are run by the affiliates, not by PPFA. Ex. 5 at 1-2. It is only on affiliates' websites—and not on PPFA's Website itself—that a website visitor can create (and enter the contact information necessary to book) an appointment. Ex. 2 at 17-20.

Like many websites—including the Northern District of California's—PPFA's Website uses analytics technologies to help PPFA understand how visitors to the Website interact with it. *See* Ex. 6 (Vint Report) ¶¶ 30-32. These technologies provide website operators like PPFA (as well as this Court, and innumerable others) with aggregated information—*i.e.*, information about website visitors as a whole, as opposed to information connected to any particular visitor—on topics like (a) website traffic (*e.g.*, number of unique visits to a webpage, how visitors land on the website, number

of purchases), (b) marketing campaign efficacy (*e.g.*, percentage of visits that led to purchases), and (c) website security (*e.g.*, classification of visitors as humans rather than bots or malicious attackers). *See id.* ¶ 32.

**B. The Specific Technologies At Issue In This Case Either Do Not Collect Personally Identifying Information At All (Google Analytics) Or Do So Only In Limited Circumstances (Meta Pixel).**

This lawsuit focuses on two technologies, Google Analytics and Meta Pixel. *See* Mot. 2. In truth, however, only the Meta Pixel is material to Plaintiffs' claims (and their Motion), because Plaintiffs have admitted that they have no evidence that could show which "potential class members"—if any—had any relevant interaction with Google Analytics. Mot. 20; *see also* Robinson Decl. ¶ 16. Regardless, with one exception explained below, the two technologies perform the same basic function: each transmits (to Google and Meta respectively): (1) the "URL of the page visited" by the user; (2) "[t]he referring page's URL" (*i.e.*, the URL of the page the user is coming from); (3) the user's IP address; (4) certain properties of the user's browser (*i.e.*, type, version, and operating system), sometimes called "user agent"; and (5) certain properties of the user's device (*i.e.*, language and time zone settings, operating system and browser version). *See* Ex. 7 (Shafiq Report) ¶¶ 66-67, 107 & nn.152-53.

In some specific circumstances, the Meta Pixel can also transmit a cookie (called the "c_user cookie"), "containing [a] Facebook account identifier." *Id.* ¶ 40(d). Specifically, the c_user cookie will be transmitted only if an individual visits a website with the Meta Pixel using the same device and browser on which they are also presently logged into their Facebook account, and does so with a browser that does not block the transmission of third-party cookies. Said otherwise, to determine whether the c_user cookie was transmitted for any particular website visit, one would need to evaluate at least the following factors:

(1) does the visitor have a Facebook account;

(2) was the visitor signed into Facebook when they visited PPFA's website;

(3) did the visitor use the same device and browser to sign into Facebook and also visit PPFA's website;

(4) did the visitor's browser block third-party cookies, either by default (as, e.g., Safari does), or by active configuration by the user (via, e.g., Firefox's Facebook Container or Chrome's Google Analytics Opt-Out).

Only if the first three questions are all answered yes, and the fourth is answered no, will a c_user cookie be transmitted.

That means, for instance, that a c_user cookie will never be transmitted for individuals who do not have a Facebook account. That is because the entire point of the c_user value is to correlate a user to a particular Facebook account, so it will exist only if the user has a Facebook account. Ex. 6 (Vint Report) ¶ 99; Ex.8 (Cohen Report) ¶¶ 109-110. In this scenario, if a website visitor does not have a Facebook account, they will not have a c_user value, and no c_user value will be transmitted via the Meta Pixel. Ex. 6 (Vint Report) ¶ 99.

Likewise, a c_user cookie will not be transmitted unless a user visits PPFA's Website with the same device and browser on which they are presently logged into their Facebook account. That is because the c_user value is stored when a user logs into Facebook—but only on the device and browser they use when they complete that login. *Id.* ¶¶ 101-11; *see also* Ex. 8 (Cohen Report) ¶ 110. The c_user value thus only exists on the specific device-browser combination(s) where a user is signed into Facebook, and on Facebook's servers. Ex. 6 (Vint Report) ¶ 101. For example, if a user logs into their Facebook account on their laptop, using the Chrome browser, a c_user value would be stored with respect to that specific device-browser combination—*i.e.*, laptop-Chrome combination. *See id.* In this scenario, if the user visits PPFA's Website using Safari, no c_user value will be transmitted to Facebook, because the user visited PPFA's Website using a browser different from the one used to log into Facebook. *See id.* ¶ 109. Likewise, if a person uses Safari on a laptop to visit Facebook and Safari on a mobile device to visit the PPFA Website, no c_user value will be transmitted to Facebook for activity on the mobile device, because the user visited PPFA's Website using a different device-browser combination from the one used to log into the user's Facebook account. *See id.* ¶¶ 101-05. Similarly, if a person uses Chrome on a laptop to visit Facebook, then logs out of Facebook, and then uses the same Chrome browser on the same laptop to visit the PPFA website, no c_user value will be transmitted to Facebook, because they are no longer logged in. *Id.* ¶¶ 106-08. And of course, if a person logs into Facebook via the Facebook mobile application, as over 98% of Facebook users do, there would be no browser for a c_user cookie to be placed at all,

so no c_user cookie would be transmitted for any website visit, no matter which browser was used. *Id.* ¶¶ 120-21.

While the above conditions are necessary for the transmittal of a c_user cookie, they are not sufficient. Even if a person visits a website from the same browser and device that they have used to log into Facebook, the c_user cookie will still not be transmitted unless further conditions still are satisfied. Several browsers, for instance Safari, will block the c_user cookie by default. *Id.* ¶¶ 112-14. So, the c_user cookie cannot be transmitted for users of those browsers, unless the user affirmatively opts to change the browser's default configurations. *Id.* And even in the circumstances where an individual's browser did not block transmission of the c_user cookie by default, some other common piece of software—such as Firefox's Facebook Container—still can. *Id.* ¶¶ 115-16. So, for any user where at least one of those other programs is active, the c_user cookie will not be transmitted. *Id.*

Each of those conditions is specific to the particular circumstances of each individual website visitor. Only with each of those pieces of person-specific information can one determine whether the c_user cookie was transmitted for any given website visit. Even then, the c_user value is transmitted only to Meta, as the Facebook Pixel does not provide website owners (like PPFA) access to any c_user values. *Id.* ¶ 45. Google Analytics has no similar functionality to a c_user cookie—*i.e.*, "a cookie value that is associated with a user's Google account such as Gmail, Google Docs, etc." *Id.* ¶ 48.[3]

### C. Contrary To Their Claims, Plaintiffs Have Adduced No Evidence That Private Information About Their Purported Visits To PPFA's Website Was Transmitted To Google And Meta.

Plaintiffs claim that when they visited PPFA's Website, the Meta Pixel automatically transmitted information to Meta, which "Meta use[d]" to "identify" Plaintiffs "and their actions . . .

[3] While both Google Analytics and Meta Pixel can transmit information from other cookies, *see* Ex. 6 (Vint Report) ¶¶ 40-50, none of those other cookies contains information "correspond[ing] to a person or account." *Id.* ¶ 42, 49. Instead, all other cookie information that is transmitted simply "represents a device-browser pairing," *id.*, and thus is largely duplicative of the device and browser information already addressed in text above. Unsurprisingly, Plaintiffs have not attempted to argue that any of these cookies are material to their motion or claims; instead, to the extent their motion mentions cookies at all, it is solely in the context of those "containing information relating to Website users' Meta account identifiers"—*i.e.*, the c_user cookie discussed in text. *See* Mot. 19.

on [PPFA's] Website," which they say constitutes a violation of Cal. Penal Code § 631's prohibition on illegal wiretapping. *See, e.g.*, FAC ¶ 73.[4] On that basis, Plaintiffs seek to represent a class of "[a]ll persons who, between September 1, 2022, and July 6, 2023, while in California" either:

> (1) searched for any of the following healthcare topics using the plannedparenthood.org website search bar: abortion, STD testing, birth control, pregnancy testing, hormone therapy or emergency contraception; or
>
> (2) visited any of [an enumerated list of] plannedparenthood.org healthcare webpages for services relating to abortion, STD testing, birth control, pregnancy testing, hormone therapy or emergency contraception:
>
> https://www.plannedparenthood.org/abortion-access
>
> https://www.plannedparenthood.org/get-care/our-services/stdtesting-treatment-vaccines
>
> https://www.plannedparenthood.org/get-care/our-services/birthcontrol
>
> https://www.plannedparenthood.org/get-care/ourservices/abortion-services
>
> https://www.plannedparenthood.org/get-care/ourservices/pregnancy-testing-services
>
> https://www.plannedparenthood.org/get-care/ourservices/transgender-hormone-therapy
>
> https://www.plannedparenthood.org/get-care/ourservices/emergency-contraceptive

Mot. i. But despite nearly a year of extensive discovery, Plaintiffs have adduced no evidence that personal information about their visits to PPFA's Website was transmitted to Meta. In fact, there is no evidence that Plaintiffs are even members of the class they propose to represent.

[redacted]

---

[4] As noted above, *see supra* n.1, Plaintiffs also made a similar allegation with respect to Google Analytics and Google, but that assertion is no longer relevant given that Plaintiffs now admit they have no evidence to sustain that assertion.

[redacted]

[redacted]

**Google**. Plaintiffs concede that Google retained no data regarding Plaintiffs'—or any putative class members'—visits or interactions with the Website. *See* Robinson Decl., ¶ 17. So, there is simply no evidence that Google collected any information about Plaintiffs whatsoever.

[redacted]

None of that is surprising. Neither Plaintiff has provided evidence showing that a transmission of the c_user cookie (the cookie that would have indicated their Facebook accounts) was even ***possible*** during their visits. Plaintiffs concede that their respective devices have no

[5] A Facebook user's Off Meta Activity Report will contain a complete list of all of that user's "off Facebook/Meta activity, or the sites the visited which run the Facebook Pixel" for which Meta has a record. Ex. 6 (Vint Report) ¶ 52. A Facebook user can generate such a report by accessing their Facebook profile dashboard, which both Plaintiffs did here. *Id.* Here, both Plaintiffs produced reports covering the Class Period.

evidence that would substantiate any of their claims. *See* Dkt. No. 63 at 1 (Plaintiffs conceding that "Plaintiffs' search of their devices for information regarding visits to PPFA's website yielded nothing"); Dkt. No. 64 (Court ordering that Plaintiffs "will be held to that representation"). And [redacted]

Simply put, all evidence indicates that neither Meta nor Google collected information identifying Plaintiffs' visits to the Website (much less that Plaintiffs conducted any specific search or visited any specific page on the Website), and that Plaintiffs thus have not suffered the injury for which the class seeks to recover. Indeed, there is no evidence that Plaintiffs are members of their proposed class at all.

## II. LEGAL STANDARD

Plaintiffs seeking to certify a class have the burden of showing the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy, as well as the requirements for one kind of class under Rule 23(b). Fed. R. Civ. P. 23. These are "stringent requirements" that "in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) ("[A] party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23" through "evidentiary proof.") (citation modified). There are no presumptions in favor of certification: "actual, not presumed, conformance"

with Rule 23 is "indispensable." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

## III. ARGUMENT

### A. Plaintiffs Have Not Satisfied The Requirements For Certifying A Class Under Rule 23(a), Because They Are Neither Typical Nor Adequate Class Representatives.

Rule 23(a) permits the court to certify a class only if Plaintiffs are both "typical" and "adequate" class representatives. A plaintiffs' claims are not typical if they do not share "the same or similar injury" suffered by "other members" of the proposed class. *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 458 (S.D. Cal. 2014) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). And a plaintiff cannot be "an adequate representative" if they are "not a typical representative." *Fine v. ConAgra Foods, Inc.*, 2010 WL 3632469, at *4 (C.D. Cal. 2010). Here, Plaintiffs are neither typical nor adequate as—for several reasons—they themselves have not suffered the injury for which they seek to recover on behalf of the class.

As an initial matter, Plaintiffs have not even established that they are members of their own putative class. As noted above, Plaintiffs seek to represent a class of individuals who (while in California, within a specified date range) either (1) entered the terms "abortion," "STD testing," "birth control," "pregnancy testing," "hormone therapy," or "emergency contraception" in the "plannedparenthood.org website search bar" or (2) "visited any of [several enumerated] healthcare" [redacted]

[redacted]

What is more, Plaintiffs claim that class members suffered a privacy injury when "Meta use[d]" information transmitted by PPFA's Website to "identify each specific individual [PPFA] [redacted] members" of the proposed class, and thus are neither typical nor adequate representatives. *Algarin*, 300 F.R.D. at 458.

What is more, Plaintiffs have not even established that Meta could have identified them with their activity on PPFA's Website. As Plaintiffs themselves acknowledge, Meta's ability to identify a website visitor turns on its collection of "cookies containing information relating to Website users' Meta account identifiers." Mot. 19. As discussed above, *supra* § I.B, whether the c_user cookie—the only one that conveys "Meta account identifiers," Mot. 19—was actually transmitted to Meta for a given website visit depends on a number of variables, particular to each website visitor:

(1) whether the visitor had a Facebook account;

(2) whether the visitor was signed into Facebook when they visited PPFA's website;

(3) whether the visitor used the same device and browser to sign into Facebook and visit PPFA's website;

(4) whether that browser was configured by default to block third-party cookies (as, e.g., Safari is), or by the user to do so (via, e.g., Firefox's Facebook Container or Chrome's Google Analytics Opt-Out).

Ex. 6 (Vint Report) ¶¶ 95-135. Plaintiffs, however, provide no evidence of which browser or device they used for any specific visit to PPFA's Website, how any such browser was configured regarding cookies, which browser or device they used to log into Facebook before any specific visit, and [redacted] Plaintiffs, in other words, have failed to "produce[] evidence of any data collected from them," and so "it is not even clear that they have suffered any cognizable injury, while it appears that at least some class members may have." *Griffith v. TikTok, Inc.*, 2024 WL 4308813, at *9 (C.D. Cal. 2024). That alone is reason to hold that they are insufficiently typical or adequate for certification under Rule 23(a). *Id.*

Plaintiffs are thus exceptionally poor—and certainly not typical or adequate—representatives of the class they seek to certify. Not only are they likely not even members, but even if they were, there is no evidence that they suffered the injury for which the putative class seeks to recover. Plaintiffs have thus failed to show that they have satisfied the requirements of Rule 23(a), and so for this reason alone their motion for class certification should be denied in its entirety.

### B. Plaintiffs Do Not Meet The Requirements For Certifying A Class Under Rule 23(b)(3), Because Individualized Questions Predominate.

Plaintiffs' request to certify a damages class separately fails, because a court may certify such a class only if "the court finds that the questions of law or fact common to class members

predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). That means that to obtain damages class certification, a plaintiff must show that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). As the Ninth Circuit recently explained, however, a plaintiff cannot make that showing when "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person." *Ambrosio v. Progressive Preferred Ins. Co.*, 154 F.4th 1107, 1112 (9th Cir. 2025) (quoting *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022)).[6] Said otherwise, if Plaintiffs cannot prove on a classwide basis that each putative class member actually suffered the injury Plaintiffs' lawsuit seeks to vindicate (and instead must resort to individualized proof), then a damages class cannot be certified. That is exactly the case here.

Plaintiffs' theory of harm is that putative class members' privacy was violated when "Meta use[d] the information that [PPFA] unlawfully disclose[d] to it in order to identify a specific person and their actions and communications on [PPFA's] Website." FAC ¶ 73; *see also, e.g.*, Mot. 18 (asserting that PPFA "violated class members' privacy rights").[7] The caselaw is clear, however, that a ***supposed*** privacy violation due to "tracking of [the plaintiff's] interactions with [a] website" gives rise to a legally cognizable injury only where it involves the collection of sufficiently "sensitive" information. *Popa*, 153 F.4th at 791 (affirming dismissal of wiretapping claim because plaintiffs failed to show collection of sufficiently private data). That is because only "disclosures" of "embarrassing, invasive, or otherwise private information" would have been "actionable at common law." *Id.*; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 433 (2021) (explaining that, for

[6] Here, as in *Ambrosio*, a showing of harm for each class member is required both by principles of Article III standing and the specific requirements of Plaintiffs' statutory wiretapping claim. *See Popa v. Microsoft Corp.*, 153 F.4th 784, 789 (9th Cir. 2025) (dismissing wiretapping claim for lack of Article III standing where plaintiffs failed to adequately allege a privacy injury); Cal. Penal Code § 637.2(a) (providing a cause of action for wiretapping only to individuals who have been "injured").

[7] As mentioned above, although Plaintiffs' Motion makes various references to both Meta and Google, Plaintiffs ultimately recognize that their theories as to Google are a dead end, as Google informed Plaintiffs that it "does not retain" relevant data from the class period. Mot. 20. Accordingly, while Plaintiffs maintain that "there are potential class members whose private communications were intercepted by Google during the Class Period," they—admittedly—have no evidence to prove that contention. *Id.*

intangible harms like a supposed invasion of privacy, Article III standing exists where the injury "bears a sufficiently close relationship to [a] harm" that would have been actionable at common law). Information that "'lack[s] … identification or identifiability'"—by definition—is not sufficiently sensitive to meet that bar. *Dinerstein v. Google, LLC*, 73 F.4th 502, 513 (7th Cir. 2023) (quoting *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 230, n.12 (1998)); *see also Popa*, 153 F.4th at 794. It is thus not enough to merely show that the information collected concerned a sensitive topic; rather, to give rise to an actionable claim, that information must specifically identify the person to whom it pertains. Accordingly, to achieve certification of their putative damages class, Plaintiffs must be able to show—on a classwide basis—that each putative class member suffered the collection of *personally identifying information*.

Plaintiffs have no proof of this. The closest they come is their assertion that, with information the Meta Pixel collects from PPFA's Website, when "Meta Pixel intercept[s] a communication of a PPFA Website user … Meta ***can*** also identify the user." Mot. 4 (emphasis added); *see also* Mot. 20 ("Meta ***can*** match PPFA website users … with known Meta account holders." (emphasis added)). As explained below, that contention falls short for at least three reasons.

### 1. Showing The Requisite Injury Requires Demonstrating That Meta *Actually* Linked A Person's Website Visit To Their Identity—Not Just That It *Could*—Which Implicates A Host Of Individualized Inquiries.

As an initial matter, Plaintiffs' theory fails because it does not show what Meta actually did; instead, it just shows (at most) that Meta ***could have*** identified putative class members when they visited PPFA's Website. As shown just above (*see supra*), Plaintiffs themselves frame their assertions about Meta in terms of what Meta might be able to do, not what it actually did—asserting that when "Meta Pixel intercept[s] a communication of a PPFA Website user, … Meta ***can*** also identify the user." Mot. 4 (emphasis added); *see also* Mot. 20 ("Meta ***can*** match PPFA website users whose private communications were intercepted by Meta with known Meta account holders." [redacted]

[redacted]

Court that "[w]hile Meta has the ability to do the matching, they don't actually do the matching" as a general matter. Ex. 1 at 5:1-3. In short, at absolute best, Plaintiffs are arguing that there was the *possibility* that Meta could have done this identification (although even that is dubious).

The law is clear that the mere possibility that a third party may identify a website visitor is not enough to show a cognizable privacy injury. Courts have recently and repeatedly found no such injury—and thus no Article III standing—on theories nearly identical to the one Plaintiffs maintain here. In *Mitchener v. Talkspace Network LLC*, 2025 WL 1822801 (C.D. Cal. 2025), for instance, the plaintiff sought to bring a CIPA claim to vindicate a privacy injury—just as Plaintiffs do here—based on the actual collection of her "IP address," along with assertions about other information that the TikTok Pixel was supposedly "capable of collecting" and using that "to identify website visitors." *Id.* at *1, *6-*7. As the court explained, however, what a company merely "may be capable" of doing "cannot be used to establish" an actual, legally cognizable injury as required for Article III standing, because such an injury "must be real" and "actually exist." *Id.* at *7. Similarly, in *Heiting v. FKA Distrib. Co.*, 2025 WL 736594 (C.D. Cal. 2025), the court held that the mere possibility that the TikTok Pixel could de-anonymize a website visitor was not enough to establish the injury-in-fact required for a CIPA claim. Instead, the visitor must show that "she was indeed de-anonymized." *Id.* at *3. And just a couple months ago, Judge Wise twice did the same, holding in two separate cases that there can be no legally cognizable privacy injury to support standing for a CIPA claim based on the theory that a third-party (again, TikTok, via its Pixel) "*could* gain 'additional information about a visitor such as name, date of birth and address," and thereby "*could* intrude on Plaintiff's right to privacy." *Kishnani v. Royal Caribbean Cruises Ltd.*, 2025 WL 1745726, at *4 (N.D. Cal. June 24, 2025); *Mitchener v. CuriosityStream, Inc.*, 2025 WL 2272413, at *5 (N.D. Cal. Aug. 6, 2025) (same). After all, Judge Wise explained, that "hypothetical" harm

falls short of the "concrete harm" that the law demands—which can be satisfied only by a showing that the third-party *actually* "collected [the particular plaintiff's] biographical information." *Id.*; *see also, e.g., Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 724 (9th Cir. 2017) (explaining that the "collection and storage of non-individually identifiable" information does not constitute "an actual injury"); *Mikulsky v. Noom, Inc.*, 2024 WL 251171, at *4 (S.D. Cal. 2024) (explaining that there is no "reasonable expectation of privacy over [the capture of] anonymized data" and collecting cases).[8]

Those decisions are of a piece with the broader privacy caselaw—on which the standing analysis is in turn based, *see, e.g., TransUnion*, 594 U.S. at 433—holding that no common-law privacy injury occurs based on the mere ***possibility*** that an otherwise anonymous website visitor may be identified. In *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012), for instance, then-District Judge Koh rejected an invasion of privacy claim based on the theory that "third parties ***could***, through inferences, de-anonymize" a website user, because "it [wa]s not clear that anyone has ***actually*** done so." *Id.* at 1025 (emphasis added). And the court in *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117 (S.D. Cal. 2023), did the same—as to the very technology (the Meta Pixel) at issue here—holding that the mere ***possibility*** that Meta "could … de-anonymize[]" medical data received through its Pixel was insufficient to show the "highly offensive" invasion of privacy required to state a cognizable injury, because "it is not clear that anyone has actually done so." *Id.* at 1126.

That fundamental rule traces back at least to Blackstone, who explained that "eaves-dropp[ing]" was actionable at common law only if the defendant performed his "listen[ing]" in order "to frame slanderous and mischievous tales" about the victim—*i.e.*, only if he knew the victim's identity and sought to use the ill-gotten knowledge against her. 4 W. Blackstone, Commentaries on

[8] This Court's decision in *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557 (N.D. Cal. 2025), is not to the contrary. While *Frasco* states that a "privacy injury occurs at the point of interception without consent, irrespective of whether the misappropriated data is anonymized" afterwards, the opinion itself makes clear that statement does not refer to the question (as is in this case) of whether there is injury where no information that identifies a website visitor is ever captured or transmitted; instead, it refers to a question (unlike in this case) of whether an injury occurs where "personal information is obtained in the first instance" and then later (ostensibly) "stripp[ed]" of its identifying information. *Id.* at 579. And even as to those circumstances, *Frasco* is of little ongoing vitality, as its discussion relied on *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020)—a decision the Ninth Circuit subsequently called into considerable doubt. *Popa*, 153 F.4th at 794-95; *see also Price v. Converse, Inc.*, 2025 WL 3295119, at *3 (C.D. Cal. 2025) (dismissing similar claim for lack of standing, and rejecting plaintiff's reliance on *In re Facebook* in light of *Popa*).

the Laws of England *169. As the U.S. Solicitor General has put it: The mere fact "that a website operator would be able to determine that *someone* conducted the searches [Plaintiffs] allege" does not constitute the "'highly offensive …' harm contemplated by the common law." Supplemental Brief of the United States at 17, *Frank v. Gaos*, No. 17-961 (Nov. 30, 2018); *see also Frank*, 586 U.S. 485 (2019) (vacating decision finding injury based on collection of anonymous data).

There are thus at least half a dozen decisions—in cases exactly like this one—holding that the mere fact that a company like Meta *could* identify a website visitor is insufficient to show a legally cognizable injury. Rather, to have an actionable harm, a visitor must show that she *actually was* identified. Plaintiffs have not even tried to show they could prove this on a classwide basis (and have thus waived any attempt to do so). But the evidence makes clear that no such showing is possible, since no such identification occurred as to Plaintiffs themselves. For this reason alone, Plaintiffs' motion to certify a damages class should be denied.

**2. Plaintiffs' Reliance On "Cookies Containing Information Relating To Website Users' Meta Account Identifiers" Implicates Even More Dispositive Individualized Inquiries.**

Plaintiffs' theory of injury separately fails because it steers into a host of individualized inquiries. The problem stems from Plaintiffs' acknowledgment that Meta's ability to identify a user turns on its collection of "cookies containing information relating to Website users' Meta account identifiers." Mot. 19. As discussed above, the only cookie data that conveys "Meta account identifiers" is the Meta c_user cookie, which could—but would not always—fire during operation of the Meta Pixel. *See, e.g.*, Ex. 8 (Cohen Report) ¶¶ 104, 110-11, 149; Ex. 6 (Vint Report) ¶¶ 44-5, 95-137. That same undisputed testimony makes clear that the c_user cookie would fire during a particular website visit only if ***all*** of the following conditions—specific to each individual and website visit—were met:

(1) the visitor had a Facebook account;

(2) the visitor was signed into Facebook when they visited PPFA's website;

(3) the visitor used the same device and browser to sign into Facebook and visit PPFA's website;

(4) that browser was not configured to block third-party cookies either by default (as, e.g., Safari is), or by active configuration from the user (via, e.g., Firefox's Facebook Container or Chrome's Google Analytics Opt-Out).

Ex. 6 (Vint Report) ¶¶ 95-135.

There is no way of proving on a classwide basis that each of those conditions was satisfied for each and every putative class member. In other words, only by proving that all of the above conditions were in place, can the Court conclude that a class member was harmed. That problem is fatal. That showing would require common evidence that "each class member could have relied on … to establish liability if he or she had brought an individual action." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022) (*en banc*) (quoting *Tyson Foods*, 577 U.S. at 455). Here, however, undisputed expert testimony makes clear that no such evidence could exist, as "the only way to determine a user's unique browser setting is to inquire with the user, as to a particular browsing session." Ex. 6 (Vint Report) ¶ 91. Because every putative class member's injury will thus turn on "substantial issues about remaining logged into Facebook and clearing and blocking cookies," a court "cannot conclude" that "common issues predominate over the individual ones." *In re Hulu Priv. Litig.*, 2014 WL 2758598, at *22 (N.D. Cal. 2014) (denying class certification).

Plaintiffs have no answer to this. In light of the undisputed testimony discussed above, Plaintiffs do not even attempt to argue otherwise, and other than one perfunctory mention of "cookies," do not engage with this issue at all. Plaintiffs' failure to offer anything of substance on this dispositive matter in their opening brief means that they have waived the issue, and forfeited the ability to do so in reply. *See, e.g.*, *Scott v. AT&T Inc.*, 790 F. Supp. 3d 781, 792 (N.D. Cal. 2025) (an argument "not made in a party's opening brief … is deemed waived"); *see also* Standing Order for Civil Cases ¶ 15 ("Reply papers should not raise new points that could have been addressed in the opening motion or brief.").

More generally, Plaintiffs' reliance on "cookies containing information relating to Website users' Meta account identifiers," Mot. 19, alone implicates a number of individualized inquiries, and thus precludes any ability to show injury with classwide proof. For this separate reason, Plaintiffs have failed to satisfy Rule 23(b)(3), and their motion to certify a damages class should be denied.

### 3. Courts Have Already Rejected Plaintiffs' Misleading Contention That They Can Establish Classwide Injury By Showing Meta Can "Identify" Users.

Plaintiffs fare no better with their fallback argument that they can show classwide injury based on Meta's supposed ability to "identify [any] user" of PPFA's website even without the c_user cookie, because it rests on a sleight of hand about what Plaintiffs mean when they say "identify." Mot. 4. As Plaintiffs acknowledge (though they try to bury it), their argument is based on a highly idiosyncratic definition of "identifiability"—one that refers not to any actual connection to a real-world individual, but instead on the purely mathematical concept of "bits of entropy," with "32 bits of entropy" being treated "as an identifiability threshold." Mot. 2-4. Although Plaintiffs—in their effort to disguise their reliance on this highly peculiar meaning—do not stop to explain what this technical jargon means, their expert's report does, *see* Ex. 7 (Shafiq Report) ¶¶ 123-34: A "bit" in this context is simply a "binary digit"—*i.e.*, a 0 or a 1. A single bit can thus represent two numbers (again, 0 and 1). Two bits can represent four numbers (00, 01, 10, and 11). Three bits can represent eight numbers (000, 001, 010, 011, 100, 101, 110, and 111). And so on. Following this same pattern, thirty-two bits can represent a little over 4 billion numbers (4,294,967,296, to be precise). *See id.* ¶ 125. Because there also happen to be about 4 billion internet users on Earth, "32 bits" of data is all that is required to—in theory—have one number for every internet user without needing to repeat. *Id.* It is in this sense—and only in this sense—that elements of data with at least 32 bits of data are said "to be identifiable." *Id.* ¶ 127. Accordingly, as used by Plaintiffs (and their expert) "identifiable" has nothing to do with ***actually*** assigning or connecting any data to any particular person. Instead, it is a purely numerical concept, which simply asks how many different values a particular data field or field can take on. *See id.* Thus, when Plaintiffs (and their expert) say that an "IP address by itself" is "identifying," all they mean is that its "length" is at least "32 bits"—not that they can tell from the "IP address by itself" who is the particular person who actually accessed a website. *See* Ex. 19 at 106:24-109:20 (explaining that while an "IP address" can help to "create uniqueness," an "IP address alone" does not "equate to identifiability"—*i.e.*, "information sufficient to understand the identity of [an] individual in the real world"); *see also* Ex. 8 (Cohen Report) ¶¶ 139-146 (the "'32-bit entropy'

argument describes a theoretical possibility, not an established likelihood, of re-identification").

Indeed, Judge Blumenfeld recently admonished Plaintiffs' same expert—and refused to certify a damages class (also in a CIPA action; there, involving the TikTok Pixel)—for reliance on exactly this kind of deception. *Griffith*, 2024 WL 4308813, at *2. There, as here, Plaintiffs' same expert claimed that "the combination of a user's IP address and user agent (*e.g.*, browser) can be used as [an] identifier[]." *Id.*; *compare* Mot. 19 (pointing to "IP addresses[] and user agents" as the supposedly "identifying information" at issue here). As Judge Blumenfeld explained, however, that representation was highly misleading, as it used the term "identify" to "mean[] something narrower" than the usual understanding of that term. *Griffith*, 2024 WL 4308813, at *2. Contrary to the suggestion of Plaintiffs' expert, IP address and user agent cannot "disclose *who*" a particular website visitor is; rather, at most, they could merely "tend[] to show that the same person visited" various websites, if those visits were made by "the same combination of IP address and user agent." *Id.* But "[m]erely learning that the same person visited other sites is not the same as discovering a user's identity." *Id.* at *3. And "absent the collection of personally identifying information (PII) such as name, address, phone number, or email address linked to the IP address and user agent"—none of which Plaintiffs can demonstrate here—there is no way to link IP and user agent to a particular person's real-world identity. *Id.* at *2.

Plaintiffs' argument here is nothing but a resurrection of that same theory. Ex. 7 (Shafiq Report) ¶¶ 130, 134-35. It should fail here just as it did in *Griffith*.[9] For this reason, too, Plaintiffs'

---

[9] In fact, Plaintiffs' case for class certification is even weaker than that in *Griffith*. That is because the *Griffith* putative class was limited exclusively to "non-users" of TikTok. 2024 WL 4308813, at *2. Here, by contrast, Plaintiffs make no such limitation, and so attempt to certify a class of users and non-users alike. As a result, Plaintiffs have to contend with additional individualized considerations, not present in *Griffith*—including not just whether each putative class member was a Facebook user or not, but also what effect their registration for that membership has on their ability to maintain these claims. For instance, it is well-established that to become a Facebook user, an individual must agree to Meta's Terms of Service—which require individuals to consent to exactly the data sharing about which Plaintiffs complain here, and thus precludes exactly the kind of privacy claims that Plaintiffs' action seeks to maintain. *See Lloyd v. Facebook, Inc.*, 2022 WL 4913347, at *10 (N.D. Cal. 2022) (holding that an individual's assent to the Terms of Service means "there [is] no reasonable expectation of privacy" against data being shared with Facebook). Whether and to what extent those Terms are enforceable against any specific class member may depend on the exact version of the Facebook interface they encountered when they registered for an account. *See generally Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (whether a particular

motion to certify a damages class should be denied.

**C. Plaintiffs' Cursory Attempt To Certify A Class Under Rule 23(b)(2) Fails.**

Plaintiffs make only the barest of arguments for certification of an injunctive relief class under Rule 23(b)(2), devoting only two short paragraphs to the issue—one simply reciting the legal standard, and one asserting (in three conclusory sentences) that the standard is satisfied. Mot. 18. That Plaintiffs have "offered [so] little in the way of support for [their proposed] Rule 23(b)(2) injunctive relief class" is alone reason to deny it. *In re Capacitors Antitrust Litig.(No. III)*, 2020 WL 6462393, at *8 (N.D. Cal. 2020).

Just as important, Plaintiffs' cursory treatment falters substantively as well, as it utterly fails to show that Plaintiffs have satisfied the Rule 23(b)(2) requirements. It is elementary that "[a] Rule 23(b)(2) class can only be certified if the named plaintiff shows that she herself is subject to a likelihood of future injury." *Bruton v. Gerber Prods. Co.*, 2018 WL 1009257, at *5 (N.D. Cal. 2018) (Koh, J.). That is because a likelihood of future injury is a core requirement "[t]o establish standing for prospective injunctive relief" *Id.* (citing *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007)). Accordingly, mere "'past exposure to illegal conduct'" does not suffice; instead, the named plaintiffs must show "'continuing, present adverse effects.'" *Id.* (quoting O*'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Plaintiffs, however, do not even attempt to do so. To the contrary, they expressly cut off their class period on July 6, 2023—already more than two years ago—and offer no allegations (much less any proof) about the operation of PPFA's website after that date. *See* Mot. 19. Given that Plaintiffs themselves expressly *avoid* any allegation (or, again, proof) about the present operation of PPFA's website, they certainly have failed to show that it subjects them to a "likelihood of future injury" as Rule 23(b)(2) requires. *Bruton*, 2018 WL 1009257, at *5. For this reason alone, their injunctive relief class fails.

Timing issues aside, a court may only certify a class under Rule 23(b)(2) if the plaintiff can show that "the party opposing the class has acted or refused to act on grounds that apply generally

---

registration interface gives sufficient notice of the Terms of Use to render them legally binding is a "context-and fact-specific" inquiry (citation omitted)). But that only underscores the host of individualized inquiries that Plaintiffs' putative class will require, beyond those present in *Griffith*.

to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." To make that showing, Plaintiffs must (at a minimum) describe "'the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law.'" *In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 788, 807 (N.D. Cal. 2021) (quoting *B.K. v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019)). Plaintiffs, again, have not even tried. All they say about their proposed injunctive relief is that it would require "the cessation of the unlawful practice of permitting the interception of PPFA Website users' private communications by third parties without consent," Mot. 18—exactly the kind of "bare injunction to follow the law" that courts have ruled insufficient. *In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d at 807.

What is more, while Plaintiffs themselves recognize that a Rule 23(b)(2) class is proper only if "class members complain of a pattern or practice that is generally applicable to the class as a whole," Mot. 18, they have also failed to show even that. As explained above, the practice about which Plaintiffs complain—the supposed privacy injury arising from the facilitation of their identification by Meta—is not "generally applicable to the class as a whole," as illustrated by the fact that it has not even occurred as to Plaintiffs themselves, *id.*, or perhaps any class member given Plaintiffs' recent admission that "[w]hile Meta has the ability to do the matching, they don't actually do the matching" as a general matter. Ex. 1 at 5:1-3. This case is thus just as ill-suited for an injunctive relief class as it is a damages class. For this separate reason, Plaintiffs' motion to certify a Rule 23(b)(2) class should be denied.

**D. There Is No Way To Ascertain Membership In Plaintiffs' Proposed Class.**

Plaintiffs acknowledge that although there is no freestanding "ascertainability" requirement for class certification, ascertainability nevertheless lies at the core of several Rule 23 considerations. Mot. 18-19; *see also, e.g.*, *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 633 (9th Cir. 2020) ("Rule 23 already calls upon the district court to consider the likely difficulties of managing a class action as part of its comparative superiority analysis."); *J.L. v. Cissna*, 2019 WL 415579, at *7 (N.D. Cal. 2019) ("ascertainability" issues can arise "in the context of Rule 23(b)(3)'s predominance requirement" (citing *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136-39 (9th Cir. 2016)).

Ascertainability requires, at a minimum, that it is feasible to identify "the exact membership of the class." *Deirmenjian v. Deutsche Bank, A.G.*, 2009 WL 10671426, at *18 (C.D. Cal. 2009). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 149 (N.D. Cal. 2015). That is exactly the case here, as there is no feasible way to determine who fits within Plaintiffs' highly reticulated class definition.

Plaintiffs do not hide the fact that they lack the necessary evidence to determine membership in their proposed class. There is no dispute that this assessment cannot be made from PPFA's data, as that data does not permit identification of any visitor to its website. Ex. 2 at 20-21. Nor do Plaintiffs contend that they have the necessary data from other sources. To the contrary, Plaintiffs admit that they subpoenaed Meta and Google to search for information that might allow them to determine a list of class members—and that, as of the close of discovery, Plaintiffs have no evidence from either Meta or Google that corroborate that theory. Mot. 20. As Plaintiffs acknowledge, Google has said that it "does not retain" any such data. *Id.* And Meta has likewise "refused to produce" the requested data. *Id.* While Plaintiffs represent in their Motion that Meta somehow indicated that its refusal would give way once "a class is certified," Mot. 20, Meta itself has since made clear that Plaintiffs misrepresent its position: As Meta recently told both parties, it will not produce anything further in this litigation, full stop. Ex. 20.

As for Plaintiff's "propos[al]" that they should be allowed to "compel[]" Meta to "produce all [requested] data" "once the classes are certified," Mot. 20, that approach is both procedurally improper and substantively perverse. Procedurally, Plaintiffs' request to compel a production from Meta fails because it comes months after the September 5, 2025 close of fact discovery—to say nothing of the completion of expert discovery—without Plaintiffs raising any timely complaint that Meta had not adequately responded to their subpoena. *See* Dkt. No. 61. And substantively, Plaintiffs' request seeks nothing less than to create the injury that is supposedly the basis of their lawsuit. Plaintiffs do not ask to have Meta merely turn over data for website users who ***have previously been*** associated with PPFA website visits; instead, Plaintiffs seek ***to force Meta to perform that***

***identification now***—in Plaintiffs words, to have Meta "match the event data" collected from PPFA's website "to known Meta account holders"—and then produce data about that new, forced matching. Robinson Decl. ¶ 15. Plaintiffs acknowledge that Meta has not actually used data collected by its Pixel "to identify" visitors' "actions . . . on [PPFA's] Website"—the privacy injury that is supposedly the genesis of their lawsuit. *See, e.g.*, FAC ¶ 73; *see also* Ex. 1 at 5:1-3 (Plaintiffs admitting that "[w]hile Meta has the ability to do the matching, they don't actually do the matching."). Yet, Plaintiffs say that in order to maintain their class action, they need to force Meta to do so now—thereby causing the very injury that they complain about here. There is no reason to allow Plaintiffs to embark on such a backwards course.

Plaintiffs' contention that their proposed classes ***are*** "ascertainable" is thus really an admission that they are ***not currently*** so, but that Plaintiffs believe they ***might be*** if (1) Plaintiffs are allowed to wildly overrun the close of discovery and (2) force Meta to create and then provide the exact set of data that supposedly caused Plaintiffs' injuries in the first place. That is no basis for certifying a class. As Plaintiffs admit, class certification requires (among other things) that "class membership can be determined by objective means" and "identified through a manageable process." Mot. 21. As it stands, Plaintiffs—undisputedly—have no way of accomplishing that.[10] This, too, is an independent reason to deny Plaintiffs' motion.

## IV. CONCLUSION

For the foregoing reasons, PPFA respectfully requests that the Court deny Plaintiffs' Motion.

---

[10] Plaintiffs get nowhere with their "propos[al] that potential class members be permitted to submit declarations or affidavits" to self-certify that "they visited the PFFA website during the Class Period and navigated to [the specified] healthcare webpages or searched for [the specified] healthcare topics using the Website's search bar." Mot. 20-21. Even setting aside the highly individualized inquiries that would be required to adjudicate each of those self-certified claims, *see supra* § III.A, it is not even clear how Plaintiffs think they could generate the list of "potential class members" to winnow down through self-certification. Again, PPFA itself cannot even tell who visited any part of its website (let alone the specified pages), and Plaintiffs have offered no suggestion for how they think they could do any better.

DATED: December 5, 2025

Respectfully Submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: *\/s/ Jacob M. Heath*
Jacob M. Heath

Attorneys for Defendant PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.