Klint L. Bruno (admitted pro hac vice)
Michael L. Silverman (admitted pro hac vice)
Jamie A. Robinson (admitted pro hac vice)
Adam J. Feuer (admitted pro hac vice)
**THE BRUNO FIRM, LLC**
205 North Michigan Avenue, Suite 810
Chicago, Illinois 60601
Telephone: (312) 321-6481
kb@brunolawus.com
msilverman@brunolawus.com
jr@brunolawus.com
af@brunolawus.com

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

*Attorney for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SHIRLEY HINTON and HEATHER SHIPLEY, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.,

*Defendant*.

Case No.: 3:23-cv-04529-JD

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Date: January 22, 2026
Time: 10:00 a.m.
Location: Courtroom 11, 19th Floor
Judge: Honorable James Donato

# TABLE OF CONTENTS


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. Plaintiffs Are Typical and Adequate Class Representatives ........ 2

II. Plaintiffs Satisfy Rule 23(b)(3)'s Predominance Requirements ........ 4

A. Whether Meta and Google Were Capable of and Actually Did Link Plaintiffs' and Class Members' Communications on the PPFA Website to Their Identities Are Common Questions that Will be Resolved with Common Evidence ........ 5

B. A User's Browser Type, Cookie Settings and Logged in Status Are Irrelevant and Do Not Create Individualized Inquiries ........ 9

C. Google's and Meta's Identification of PPFA Website Users Does Not Create Individual Issues ........ 10

III. The Injunctive Relief Class Satisfies the Requirements of Rule 23(b)(2) ........ 12

IV. The Classes Are Ascertainable ........ 13

CONCLUSION ........ 15

# TABLE OF AUTHORITIES


**United States Supreme Court Cases**

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)....................4, 5

**United States Circuit Court of Appeals Cases**

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017)....................13, 15

*Just Film, Inc. v. Buono*, 847 F.3d 1108 (9th Cir. 2017)....................4

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022)...12

**United States District Court Cases**

*Bruton v. Gerber Prods. Co.*, No. 12-cv-02412-LHK, 2018 WL 1009257 (N.D. Cal. Feb. 13, 2018)....................12

*Deirmenjian v. Deutsche Bank, A.G.*, 2009 WL 10671426 (C.D. Cal. 2009)....................13

*Ernst v. ZogSports Holdings LLC*, No. 2:18-cv-09043-RGK-MRW, 2019 WL 1435933 (C.D. Cal. Feb. 21, 2019)....................15

*Frasco v. Flo Health, Inc.*, 349 F.R.D. 557 (N.D. Cal. 2025)....................4

*Griffith v. TikTok, Inc.*, No. 5:23-CV-00964-SB-E, 2024 WL 4308813 (C.D. Cal. Sept. 9, 2024).11

*In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017)....................13, 15

*Jancik v. WEBMD, LLC*, No. 1:22-cv-00644-TWT, 2025 WL 560705 (N.D. Ga. Feb. 20, 2025) .14

*Jancik v. WEBMD, LLC*, No. 1:22-cv-00644-TWT (N.D. Ga. June 27, 2024)....................14

*Kumar v. Salov N. Am. Corp.*, No. 14-cv-2411-YGR, 2016 WL 3844334 (N.D. Cal. July 15, 2016)....................15

*United Farm Workers v. Noem*, 785 F. Supp. 3d 672 (E.D. Cal. 2025)....................11

*Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554 (C.D. Cal. 2012)....................13

**INTRODUCTION**

This privacy action is perfectly suited for class treatment. [redacted]. PPFA does not dispute that it deployed these tracking technologies on its Website or that they had the effect of intercepting and transmitting thousands of Website users' private health information to Google and Meta.

PPFA tries to shift the focus from what it did—i.e., installing the tracking technologies on its Website—to the class representatives. PPFA contends that the named Plaintiffs' claims are not typical and that they are not adequate class representatives, but it ignores and misconstrues Plaintiffs' deposition testimony. Both class representatives testified that they visited the PPFA Website, plannedparenthood.org. PPFA's configuration of its Website undisputedly caused the interception of Plaintiffs' healthcare search terms and resulting page views to be shared with Google and Meta. PPFA's contention that Plaintiffs' sensitive health information was not identifiable to them is directly contradicted by Google's and Meta's own documentation describing how their tracking technologies match Website users' event data with account holders.

None of the so-called individualized inquiries PPFA raises in its Opposition predominates over the overarching common question of whether it aided and abetted third parties to intercept Website users' sensitive health information. PPFA's predominance arguments are based on its failure to recognize that Google Analytics and Meta Pixel tracking technologies cause the transmission of cookies and other types of data containing personally identifiable information in every instance, regardless of browser type, cookie settings or log-in status. Google and Meta openly advertise that they utilize various types of Website user identifying information, such as those collected via Google Analytics and the Meta Pixel, to identify specific individuals for their targeted marketing businesses. PPFA's website operates no differently, which even PPFA does not deny.

## ARGUMENT

**I. Plaintiffs Are Typical and Adequate Class Representatives.**

PPFA claims that Plaintiffs are not typical or adequate class representatives because they allegedly have not demonstrated that they are members of the classes they seek to represent. ECF No. 104 at 11-12. [redacted]

[redacted]

[redacted]. PPFA does not dispute that these tracking technologies operated in this exact manner or that the Website would work the same way for every class member.

[redacted]. Meta intentionally designed Off Meta Activity reports to be an incomplete picture of information captured by the Meta Pixel about Facebook users' online activities. The reports provide "a summary" of users' shared online activities and exclude "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device." Ex. 3, Review Your Activity Off Meta Technologies. [redacted] PPFA's use of the Meta Pixel on its Website enabled Meta to identify class members even when they were not logged into Facebook. ECF No. 93-1, Shafiq Report at ¶¶107-08, 110. Although the data produced by Meta is not complete, that does not preclude the Court from certifying the classes. Plaintiffs have requested that Meta submit a full production of PPFA Website user event data and matching account holders once the classes are certified. ECF No. 93 at 20. [redacted].

Finally, PPFA contends that Plaintiffs have not demonstrated how Meta could have identified them based on their activity on PPFA's Website because the c_user cookie is purportedly the only way Meta identifies a user. ECF No. 104 at 12-13. According to Meta's own documentation, however, the c_user cookie is not the only information Meta uses to match website user event data with specific individuals. Meta itself describes that it uses a combination of various types of

"customer information parameters" collected through the Meta Pixel to identify website users, including IP addresses, user agent information and _fbp cookies.[1] How the Meta Pixel collected, transmitted and identified all Website users in the exact same way is subject to common proof that is identical for Plaintiffs and all class members alike. [redacted]

Representative claims are typical "if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (citation omitted). It does not matter whether Plaintiffs were identified while logged into Facebook or while logged out, or whether a c_user cookie was used to identify them or an _fbp cookie. Plaintiffs' claims are typical of all class members because their claims arise out of PPFA's installation and use of third-party tracking technologies on its Website, which aided and abetted third-parties to intercept Website users' private communications containing sensitive health information in violation of Section 631 of CIPA. *See Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 574 (N.D. Cal. 2025) (typicality met where all class members used an app that intercepted sensitive health information without their consent in violation of CIPA). As Plaintiffs are typical of other class members, they are also adequate class representatives.[2]

**II. Plaintiffs Satisfy Rule 23(b)(3)'s Predominance Requirements.**

Rule 23(b)(3) certification is appropriate "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate[.]" *Tyson Foods, Inc. v. Bouaphakeo*,

---

[1] *Customer Information Parameters,* FACEBOOK FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters/ (last accessed Dec. 12, 2025).

[2] PPFA's only adequacy argument was that Plaintiffs are allegedly atypical of the class. ECF No. 104 at 12. PPFA does not dispute that Plaintiffs otherwise satisfy adequacy under Rule 23(a)(4) because they have no conflicts with other class members and will vigorously prosecute the litigation.

577 U.S. 442, 453 (2016) (citation omitted). Rule 23(b)(3) predominance is satisfied here because the "common, aggregation-enabling" issue in this matter predominates over any individual issues. *Id.* [redacted] PPFA does not dispute that it deployed tracking technologies on its Website or that the pixels disclosed Website users' sensitive health information to Google and Meta. None of the "individualized inquiries" PPFA raises in its Opposition predominate over the common question of whether PPFA's uniform conduct violated CIPA and class members' privacy rights.

### A. Whether Meta and Google Were Capable of and Actually Did Link Plaintiffs' and Class Members' Communications on the PPFA Website to Their Identities Are Common Questions that Will be Resolved with Common Evidence.

PPFA enabled Meta and Google to intercept class members' private healthcare communications and identifiers on the PPFA website *and* Meta and Google *could and did* link those communications to their identities. This is not—as PPFA contends—a question of Meta's and Google's hypothetical ability to identify a class member who researched, for example, STD testing on the PPFA Website. [redacted] Contrary to PPFA's contentions (ECF No. 104 at 15), Google and Meta actually "use identifiers intercepted via the installation of their tracking technologies on [the Website], together with their own or other identity services, *to match intercepted communications to a particular person*." ECF No. 93 at 2 (emphasis added).

The common evidence that Meta and Google actually linked content shared by PPFA to identities is found in Meta's and Google's description of the nature and purpose of their tracking technologies and is corroborated by Plaintiffs' expert. The whole purpose of tracking technologies

is, in Meta's words, "to personalize content"[3] or, as Google explains, to "understand how your customers interact" and "anticipate future customer actions."[4] The "whole point of storing identifiers in these cookies is to link them to account holders, which by definition, would mean their e-mail address, their name, their phone number and so forth…" Ex. 6, Shafiq Tr. at 118:9-119:23; 121:14-122:12.

Personalizing content and anticipating a customer's future actions can only be done by connecting a customer's actions to the customer. Meta describes the Meta Pixel as a tool that "enable[s] us to match your website visitors to their respective Facebook User accounts."[5] More importantly, Meta admits that it actually does the matching as an integral part of the services it provides to websites that enable the Meta Pixel.[6] Meta further admits that the cookies enabled by the Meta Pixel serve the purpose of personalizing content "whether or not you have a Facebook or Instagram account or are logged in."[7] Similarly, as Google explains in a post about Universal Analytics, the version of Google Analytics deployed by PPFA during the Class Period, "[i]n order for Google Analytics to determine which traffic belongs to which user, a unique identifier associated with each user is sent with each hit."[8] Meta's and Google's targeted advertising businesses are commonly understood to be among the most successful in the U.S., if not on the planet.[9] It is preposterous to assert that Meta and Google deliver on their business promise of personalizing

---

[3] *Third-Party Websites and Apps*, META PRIVACY POLICY https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.7 (last accessed Dec. 12, 2025).

[4] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/- (last accessed Dec. 12, 2025).

[5] *Get Started*, FACEBOOK FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last accessed on Dec. 12, 2025).

[6] *Id.*

[7] *Third-Party Websites and Apps*, META PRIVACY POLICY, https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.7

[8] *Analytics help*, GOOGLE, https://support.google.com/analytics/answer/2992042?hl=en (last accessed Dec. 12, 2025).

[9] S. Blancalfor, 5 companies have captured an insanely large share of the U.S. ad market over the last decade, FAST COMPANY, Oct. 9, 2025, https://www.fastcompany.com/91419317/big-tech-companies-us-advertising-share-growth-report (industry analyst predicts the five largest tech companies, including Meta and Google parent, Alphabet, will make up 65% of the U.S. advertising market this year, up from 22% 10 years ago) (last accessed December 12, 2025).

content for their customers without first matching online actions to actors. Plaintiffs' counsel's statement to the Court that Meta does not generally do the matching reflected Plaintiffs' understanding that Meta does not store its data in a matched configuration; it was not, as PPFA contends (ECF No. 104 at 16), a concession that Meta did not connect communications from PPFA Website users to a person at the time of interception.

Matching data to individual account holders works through a combination of cookies and device identifiers. ECF No. 93-1, Shafiq Report at ¶¶107-110. PPFA does not dispute that Meta can identify an account holder by the transmission of a c_user cookie (a third-party cookie) when a user is logged into Facebook. ECF No. 104 at 19. Similarly, Google's SID cookie (a third-party cookie) is transmitted when a user is logged into Google, which allows Google to identify the user. ECF No. 93-1, Shafiq Report at ¶109(a). But the c_user and SID cookies are only *one* way Meta and Google identify account holders.

[redacted]. Meta collects and stores user information including IP address, user agent, and the _fbp cookie. The _fbp cookie and _utma cookie are first party cookies containing unique device identifiers that are used by Meta and Google, respectively, to identify a website user. ECF No. 93-1, Shafiq Report at ¶40; Ex. 6, Shafiq Tr. at 130:7-131:12; 212:13-213:6.[10][11] The user agent collected by both Google and Meta contains "hyperspecific information" about a user's browser and device configurations. Ex. 6, Shafiq Tr. at 226:17-227:4. This includes the type of device, brand and model, operating system, browser type, application and file names and types[12], what a user is doing on the device (which can help tell humans from bots), GPS location, camera access, photos and related metadata, information about the network connected to the device

---

[10] *ClickID and the bbp and fbc Parameters*, FACEBOOK DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/ (last accessed Dec. 10, 2025).

[11] *Google's Privacy Policy*, GOOGLE, https://Policies.google.com/privacy?hl=en last (accessed Dec. 10, 2025).

[12] *What Device You're Using, And Other Device Characteristics*, META PRIVACY POLICY, https://www.facebook.com/privacy/policy?annotations[0]=1.ex.24-WhatDeviceYoure&subpage=1.subpage.3-AppBrowserAndDevice (last accessed Dec. 12, 2025).

including IP address, and identifiers that can tell a user's device apart from other users, such as device IDs, mobile advertiser ID, or IDs from games, apps or accounts of the website user. ECF No. 93-1, Shafiq Report at ¶107, n.152.[13][14]

[redacted]. These cookies allow Google and Meta to directly match the shared data with a user's real-world identity using their Google Account ID or Facebook Account ID, regardless of whether the user was signed into their account. ECF No. 93-1, Shafiq Report at ¶¶107-110.[15]

Whether Meta and Google can and do match the content they intercept via their pixels with a specific person is subject to common proof. The evidence either succeeds or fails for the named Plaintiffs and all class members. Plaintiffs' Off Meta Activity reports and data produced by Meta do not exclude the named Plaintiffs from the classes they seek to represent. As described in Section I., these materials are not a complete record of online activity Meta linked with Plaintiffs. The Off Meta Activity report is a red herring as it reflects only a Facebook user's online activity while logged into a Facebook account. [redacted]. [redacted]. It does not

---

[13] *App, Browser And Device Information*, META PRIVACY POLICY, https:///www.facebook.com/privacy/policy?subpage=1.subpage.3-AppBrowserAndDevice (last accessed Dec. 10, 2025).

[14] *Identifiers That Tell Your Device Apart From Other Users,* META PRIVACY POLICY, https://www.facebook.com/privacy/policy?annotations[0]=1.ex.26-IdentifiersThatTellYour&subpage=1.subpage.3-AppBrowserAndDevice (last accessed Dec. 12, 2025).

[15] Citing *How Google Uses Cookies*, GOOGLE PRIVACY & TERMS, https://policies.google.com/technologies/cookies#types-of-cookies ("The cookies and similar technologies used to authenticate users help ensure that only the actual owner of an account can access that account. For example, cookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google Account ID and most recent sign-in time") (last accessed Dec. 12, 2025).

matter whether Meta identified them with one cookie while logged into Facebook or by another cookie when they were logged out.

**B. A User's Browser Type, Cookie Settings and Logged in Status Are Irrelevant and Do Not Create Individualized Inquiries.**

According to PPFA, Meta's identification of individuals through the use of cookies raises "dispositive individualized inquiries." ECF No. 104 at 18. Specifically, PPFA claims that Meta can only identify a user if a c_user cookie is transmitted to Meta, which requires the user to be logged in to his or her Facebook account on the same device and browser they are using to visit PPFA's Website, and the user's browser must not be configured to block cookies. *Id.* This argument is based on the false premise that the c_user cookie is the only way Meta identifies a user; as discussed above in Section III. A., it is not.

[redacted] This information was shared with Meta and Google regardless of whether the individual user had a Facebook or Google account or was signed in. [17] Similarly irrelevant is whether the user's browser had a third-party cookie blocker because third-party cookie blockers do not block either first party cookies (i.e., the _fbp and _utma cookies) or the above-mentioned browser or device identifying information. [18] Ex. 6, Shafiq Tr. at 130:15-19; 259:6-21.

Therefore, contrary to PPFA's assertions, individualized inquiries into cookies, browser type or settings, or whether users were logged into a Meta or Google account will not be required to

[16] It is not Plaintiffs' contention that an IP address alone is identifying. Nevertheless, PPFA's attempt to attribute this position to Plaintiffs is irrelevant because [redacted]

[17] *Third-Party Websites And Apps,* META PRIVACY POLICY, https:///www.facebook.com/privacy/policies/cookies?subpage=subpage-1.7. (last accessed Dec. 12, 2025)

[18] *Third-Party Websites And Apps,* META PRIVACY POLICY, https:///www.facebook.com/privacy/policies/cookies?subpage=subpage-1.7. (last accessed Dec. 12, 2025)

determine class membership. Whether or not PPFA shared all of the above identifying information with Google and Meta when Website users accessed the URLs or entered healthcare search terms included in the class definition is subject to common proof.

**C. Google's and Meta's Identification of PPFA Website Users Does Not Create Individual Issues.**

PPFA also contends that Plaintiffs have a misleading definition of identification. PPFA's contention is based on Plaintiffs' reference to the well-established entropy theory of how third parties identify website users who are not their account holders. This is a side issue and a distraction because all but a negligible percentage of internet users, including all class members, have a Google or a Meta account. As explained in Section III. A. and B. above, Google and Meta identify their own account holders through the first party cookies that PPFA always shares via the Google and Meta pixels. [redacted]

Google has more than 272 million users in the United States and Meta has more than 253 million. ECF No. 93-1, Shafiq Report at ¶¶115-116. Meta account holders include users of Facebook, Instagram, Messenger and WhatsApp.[19] If a user has multiple Facebook profiles, all profiles are under one Facebook account, which allows Meta to personalize a user's experience across Meta products, including ads.[20] Google account holders include users of over 100 tech products and services for consumers under the Google umbrella, including Android, Chrome, Gmail, Fitbit, Google Pay, Waze and Nest.[21] Similar to how Meta uses Facebook accounts to streamline a user's experience across Meta's products, a Google account lets users "use an email address and password or passkey to get Google-wide access to most Google products."[22] As a practical matter,

[19] *What are the Meta products*, META, https://www.facebook.com/legal/meta-products (last accessed Dec. 12, 2025).

[20] *The Difference Between Your Facebook Account and Profile*, FACEBOOK HELP CENTER, https://www.facebook.com/help/327202558928776 (last accessed Dec. 12, 2025).

[21] *Support,* META, https://support.google.com/ (last accessed Dec. 12, 2025).

[22] *What is a Google Account?,* GOOGLE ACCOUNT HELP, https://support.google.com/accounts/answer/15277265?hl=en#:~:text=A%20Google%20Account

the entire universe of PPFA Website users, with negligible exceptions, are account holders of Meta or Google or both. The Court can determine in one stroke on a classwide basis, whether PPFA's sharing of the _fbp cookie and the _utma cookie resulted in Meta and Google's identification of a PPFA Website user's communications with his or her identity.

PPFA's attempt to apply *Griffith v. TikTok, Inc*. to its conduct (ECF No. 104 at 21) is misplaced. No. 5:23-CV-00964-SB-E, 2024 WL 4308813 (C.D. Cal. Sept. 9, 2024), reconsideration denied, No. 5:23-CV-00964-SB-E, 2024 WL 4874556 (C.D. Cal. Oct. 22, 2024). The putative class in *Griffith* consisted only of non-users of the TikTok platform whose IP address and user agent information were shared with TikTok. *Griffith*, 2024 WL 4308813, at *2. The court stated that "multiple data points showing visits to different websites by the same combination of IP address and user agent tends to show that the same person visited both sites" but "without more, this 'identifying' information does not disclose who the person is." *Id.* TikTok admitted to needing "only the IP address and the user agent to match up a data point collected *to one of their users*." *Id.* (emphasis in original). Here, as a practical matter, the entire class consists of users of either Meta or Google.[23]

With respect to the few hypothetical outliers included in Plaintiffs' class definition who were sophisticated enough to use the Website but didn't have an account that exists in Meta's or Google's universe, Meta and Google had a commercial interest in using the identifiers conveyed by their pixels to identify them as well. Whether Meta and Google succeed in identifying them is subject to common proof. ECF No. 93-1, Shafiq Report at ¶¶123-135.

However, if the Court concludes that Plaintiffs' proposed class definition is overbroad because of the possibility of a few outliers who cannot be identified as account holders by Google or Meta, Plaintiffs request leave in the alternative to narrow their proposed class definition to only Google and Meta account holders who meet all other criteria of the class definition proposed in their opening brief. *See United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 713 (E.D. Cal. 2025)

%20lets%20you%20use%20an,different%20device%20*%20Syncing%20info%20between%20services (last accessed Dec. 11, 2025)

[23] The Court should disregard PPFA's suggestion Meta's terms and conditions could render PPFA's disclosure of its Website users' sensitive communications non-actionable. PPFA provides no authority for or details about this novel position.

(collecting cases) (courts may consider proposals to change a class definition first raised in a reply brief on a motion for class certification); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 672 (9th Cir. 2022) (an overly broad class definition "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis.")

**III. The Injunctive Relief Class Satisfies the Requirements of Rule 23(b)(2).**

The Court should certify the Rule 23(b)(2) injunctive relief class because PPFA continues to aid and abet the interception of PPFA Website users' private communications by third parties via the installation of tracking pixels subjecting Plaintiffs and class members to a "likelihood of future injury." *Bruton v. Gerber Prods. Co.*, No. 12-cv-02412-LHK, 2018 WL 1009257, at *5 (N.D. Cal. Feb. 13, 2018). PPFA's privacy policy confirms that PPFA continues to employ Google Analytics and other tracking technologies on its Website that "automatically collect information about how you access the Services on our Sites, read our emails, or otherwise engage with us."[24] PPFA's privacy policy is still inadequate to obtain consent, [redacted] As argued in Section II. above, a Rule 23(b)(2) class is proper because PPFA's continued use of Google Analytics and the Meta Pixel on its Website is applicable to and affects the class as a whole. The Court should enjoin PPFA's practice of configuring third-party tracking technologies to

---

[24] *Privacy Notice*, PLANNED PARENTHOOD, https://www.plannedparenthood.org/privacy-policy#disclosure (last accessed Dec. 12, 2025).

[25] *About Us*, PLANNED PARENTHOOD, https://www.plannedparenthood.org/about-us (last accessed Dec. 12, 2025).

share Website users' healthcare search terms and the full-string URLs of the healthcare pages they visit.

**IV. The Classes Are Ascertainable.**

A class is ascertainable when it is based on objective criteria that allow potential class members to determine whether they are included in the class. *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *25 (N.D. Cal. Feb. 21, 2017) (citation omitted). The Rule 23(b)(3) Damages Class and Rule 23(b)(2) Injunctive Relief Class Plaintiffs seek to certify are sufficiently defined and ascertainable because they rely on a common set of characteristics that allow a prospective plaintiff to identify himself or herself as having a right to recover based on the description. *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 558 (C.D. Cal. 2012).

PPFA does not contend that the classes are defined with vague or subjective criteria, or that potential class members will not be able to determine if they are included in the classes. Nor does PPFA claim that class ascertainability renders this class action unmanageable. Instead, relying on case law that pre-dates the Ninth Circuit's administrative feasibility decision in *Briseno*, PPFA claims that there purportedly is no feasible way to ascertain the membership in the classes. ECF No. 104 at 24.[26] PPFA is, in effect, asking the Court to impose a "standalone feasibility requirement," which the Ninth Circuit has rejected. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017) ("the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is prerequisite to class certification"). There is a "well-settled presumption" that "courts should not refuse to certify a class merely on the basis of manageability concerns[,]" and such a ruling "is disfavored." *Id.* at 1128 (citation omitted).

Plaintiffs have presented a viable method to ascertain the identities of class members. [redacted]

[26] Citing *Deirmenjian v. Deutsche Bank, A.G.*, 2009 WL 10671426, at *18 (C.D. Cal. 2009).

[redacted] Meta used this information, along with other website user data it already has in its possession, to match PPFA Website users with known Meta account holders for purposes of disseminating targeted marketing. ECF No. 93-1, Shafiq Report at ¶¶40, 117; Ex. 8, *Jancik v. WEBMD, LLC*, No. 1:22-cv-00644-TWT (N.D. Ga. June 27, 2024), ECF No. 83-4 (declaration from Meta's software engineer describing that when the Meta Pixel is triggered and collects "event" data representing users' interactions with a website, Meta matches the event data to Meta users in order "target ads on Facebook, Instagram, and publishers within Meta's Audience Network to Meta users"). Plaintiffs propose that once the classes are certified, Meta be compelled to produce all event data from PPFA's Meta Pixel 6452 within the Class Period along with matching Meta account holder information. ECF No. 93 at 20.

PPFA mistakenly contends that Plaintiffs are somehow forcing Meta to create new data reflecting the identities of PPFA Website users (ECF No. 104 at 24-25); however, Meta already has this information readily available as it routinely matches website user event data to Meta account holders in the ordinary course in furtherance of its highly profitable targeted advertising business.[27] Plaintiffs and class members have already suffered an Article III injury-in-fact by virtue of PPFA's aiding and abetting Google's and Meta's interception of PPFA Website users' private communications. There is nothing improper about seeking class member identification information from a third-party after the class certification stage, particularly when the defendant does not maintain those records. *See, e.g., Jancik v. WEBMD, LLC*, No. 1:22-cv-00644-TWT, 2025 WL 560705, at *6 (N.D. Ga. Feb. 20, 2025) (certifying class and permitting plaintiffs' counsel to subpoena Meta for class membership identification information to confirm whether list of email subscribers had Facebook accounts and relevant event data intercepted through Meta Pixel).

[27] *Meta Business Tool Terms*, META, https://www.facebook.com/legal/technology_terms (stating that Meta uses website user event data "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Company Products") (last accessed Dec. 12, 2025).

PPFA also takes issue with Plaintiffs' proposal that class members be permitted to submit declarations or affidavits in support of their claims that they visited the PPFA Website during the Class Period and navigated to specified healthcare webpages or searched for certain healthcare topics using the Website's search bar. ECF No. 104 at 25 n.10. [redacted] PPFA does not dispute this common evidence. Google's self-serving data retention policies (ECF No. 93 at 20) should not impair thousands of potential class members from participating in this class action for PPFA's violation of their privacy rights.

The fact that class members may have to self-identify does not mean that they are not ascertainable for class certification. *In re Lidoderm Antitrust Litig.,* 2017 WL 679367, at *25 (citation omitted); *see also Briseno*, 844 F.3d at 1129. Courts in the Ninth Circuit have allowed class members to self-identify in circumstances where the defendant did not have adequate records to identify class members. *See, e.g., Ernst v. ZogSports Holdings LLC*, No. 2:18-cv-09043-RGK-MRW, 2019 WL 1435933, at *6 (C.D. Cal. Feb. 21, 2019) (certifying class and authorizing potential class members to self-identify where defendant did not maintain class member contact information); *Kumar v. Salov N. Am. Corp.*, No. 14-cv-2411-YGR, 2016 WL 3844334, at *6 (N.D. Cal. July 15, 2016) (finding class members ascertainable although class members would have to self-identify and provide other purchase-related information). PPFA's capability to determine who visited its Website (ECF No. 104 at 25 n.10) has no bearing on class members' knowledge and ability to verify via declaration or affidavit that they visited the PPFA Website during the Class Period and navigated to the class definition webpages addressing specific healthcare topics or entered specific healthcare search terms. Permitting class members to self-identify is not an issue that precludes a finding of Rule 23(b)(3) predominance or class certification. *Briseno*, 844 F.3d at 1131-32.

**CONCLUSION**

This case turns on common factual and legal issues which will be proven or disproven by common evidence. For the foregoing reasons, Plaintiffs' Motion for Class Certification should be granted.

Dated: December 12, 2025

Respectfully submitted,

By: *__/s/ Jamie A. Robinson__*

Klint L. Bruno (admitted pro hac vice)
Michael L. Silverman (admitted pro hac vice)
Jamie A. Robinson (admitted pro hac vice)
Adam J. Feuer (admitted pro hac vice)
**THE BRUNO LAW FIRM, LLC**

By: *__/s/ Bradley A. Benbrook__*

Bradley A. Benbrook
Stephen M. Duvernay
**BENBROOK LAW GROUP, PC**

*Attorneys for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing document was filed this 12th day of December 2025 via the electronic filing system of the Northern District of California, which will automatically serve all counsel of record.

*/s/ Jamie A. Robinson*
Jamie A. Robinson