Klint L. Bruno (admitted pro hac vice)
Michael L. Silverman (admitted pro hac vice)
Jamie A. Robinson (admitted pro hac vice)
Adam J. Feuer (admitted pro hac vice)
**THE BRUNO FIRM, LLC**
205 North Michigan Avenue, Suite 810
Chicago, Illinois 60601
Telephone: (312) 321-6481
kb@brunolawus.com
msilverman@brunolawus.com
jr@brunolawus.com
af@brunolawus.com

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

*Attorney for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SHIRLEY HINTON and HEATHER SHIPLEY, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.,

*Defendant*.

Case No.: 3:23-cv-04529-JD

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Date: April 2, 2026
Time: 11:00 a.m.
Location: Courtroom 11, 19th Floor
Judge: Honorable James Donato

## TABLE OF CONTENTS


INTRODUCTION ........ 1

LEGAL STANDARD ........ 2

ARGUMENT ........ 2

I. Plaintiffs Suffered an Injury in Fact ........ 2

A. In the Context of This Case, Actual Identification is Not Required to Establish an Injury in Fact ........ 3

B. Even if Actual Identification is Required, Plaintiffs Have Evidence Establishing an Injury in Fact ........ 5

II. Meta Attempted to Learn the Contents of Plaintiffs' Communications on PPFA's Website While the Communications Were in Transit ........ 9

A. The Timing of Meta's Interception of Plaintiffs' Communications on the PPFA Website is a Disputed Question of Fact Precluding Summary Judgment ........ 10

B. Whether Meta's Intentional Interception Constitutes an Attempt to Learn the Meaning of Plaintiffs' Communications is a Question That Should Go to the Jury ........ 13

III. PPFA Shared the Contents of Plaintiffs' Private Health Information With Meta Without Plaintiffs' Consent ........ 15

A. PPFA's Privacy Policy Cannot Form the Basis for Plaintiffs' Consent Because It is an Unenforceable Browsewrap Agreement and the Hyperlink to Access the Policy Was Inconspicuous ........ 15

B. Meta's Policies Do Not Sufficiently Establish Plaintiffs' Consent to Permit Meta to Acquire Sensitive Health Information from the PPFA Website ........ 17

C. None of the Cases Cited by PPFA Support the Proposition that Plaintiffs Consented to PPFA Sharing Sensitive Health Information With Meta ........ 19

IV. PPFA is Not Entitled to Summary Judgment as to Other Third-Party Trackers ........ 21

V. Plaintiffs Have Standing to Pursue Injunctive Relief ........ 23

CONCLUSION ........ 24

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........ 2
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........ 2
*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ........ 23
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........ 2

**United States Circuit Court of Appeals Cases**

*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022) ........ 16
*Calhoun v. Google LLC*, 113 F.4th 1141 (9th Cir. 2024) ........ 17, 18, 20
*Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939 (9th Cir. 2011) ........ 23
*Hollingsworth Solderless Terminal Co. v. Turley,* 622 F.2d 1324 (9th Cir.1980) ........ 2
*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) ........ 17
*Javier v. Assurance IQ, LLC*, 2022 WL 1744107 (9th Cir. May 31, 2022) ........ 17
*Keebaugh v. Warner Bros. Entm't Inc.*, 100 F.4th 1005 (9th Cir. 2024) ........ 20
*Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002) ........ 11
*Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014) ........ 16, 17
*Noel v. Hall*, 568 F.3d 743 (9th Cir. 2009) ........ 14
*Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505 (9th Cir. 2023) ........ 20
*United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992) ........ 14
*United States v. Saavedra-Velazquez*, 578 F.3d 1103 (9th Cir. 2009) ........ 13, 14
*United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998) ........ 14
*United States v. Steiger*, 318 F.3d 1039 (11th Cir. 2003) ........ 10
*Wilson v. Huuuge, Inc.*, 944 F.3d 1212 (9th Cir. 2019) ........ 16

**United States District Court Cases**

*Brown v. Google, LLC*, 685 F. Supp. 3d 909 (N.D. Cal. Aug. 7, 2023) ........ 3, 4
*D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179 (S.D. Cal. 2024) ........ 23
*Doe v. Eating Recovery Center, LLC*, 2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) ........ 12, 13, 15
*Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814 (E.D. Cal. June 9, 2025) ........ 12

*Frasco v. Flo Health, Inc.*, 349 F.R.D. 557 (N.D. Cal. 2025).................................................4, 5, 17

*Heiting v. FKA Distributing Co*., 2025 WL 736594 (C.D. Cal. Feb. 3, 2025) ..................................4

*I.C. v. Zynga, Inc.,* 600 F. Supp. 3d 1034 (N.D. Cal. April 29, 2022) ..............................................3

*In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778 (N.D. Cal. 2022)...................18, 19, 21, 24

*Jancik v. WEDMD, LLC*, No. 22-cv-00644-TWT (N.D. Ga. June 27, 2024), ECF No. 83-4 ...........6

*Kryzek v. OpenX Techs., Inc.*, 2026 WL 206855 (N.D. Cal. Jan. 27, 2026)........................10, 12, 14

*L.B. v. LinkedIn Corp.*, 2025 WL 2899514 (N.D. Cal. Oct. 10, 2025) .....................................19, 20

*Lloyd v. Facebook, Inc.*, 2022 WL 4913347 (N.D. Cal. Oct. 3, 2022) ...........................................20

*Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012) ......................................................4

*Matera v. Google Inc.*, 2016 WL 5339806 (N.D. Cal. Sept. 23, 2016) ...................................23, 24

*Michener v. Talkspace Network LLC*, 2025 WL 1822801 (C.D. Cal. June 27, 2025).......................4

*NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938 (N.D. Cal. Aug. 4, 2014) ..................10

*R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876 (C.D. Cal. 2024).........................................................18

*Silver v. Stripe Inc.*, 2021 WL 3191752 (N.D. Cal. July 28, 2021) ................................................19

*Torres v. Prudential Financial*, 2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) .............................15

*Williams v. DDR Media, LLC*, 757 F. Supp. 3d 989 (N.D. Cal. 2024)....................................13, 15

*Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041 (N.D. Cal. Dec. 30, 2024) ................................17

*Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880 (S.D. Cal. Feb. 13, 2025)....................................18

**State Court Cases**

*B.D. v. Blizzard Entm't, Inc.*, 76 Cal. App. 5th 931 (Cal. App. 2022)............................................20

*Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914 (Cal. 2006) ...............................................14

*People v. Conklin*, 522 P.2d 1049 (Cal. 1974) ...............................................................................14

**Statutes & Rules**

18 U.S.C. § 2510(4) .........................................................................................................................14

Cal. Penal Code § 631(a)..................................................................................................10, 13, 14

FED. R. CIV. P. 56(a)...........................................................................................................................2

FED. R. CIV. P. 56(d).........................................................................................................................22

## INTRODUCTION

Planned Parenthood Federation of America, Inc. ("PPFA" or "Defendant") operates the website www.plannedparenthood.org (the "Website") where people can learn about and find services for sexual and reproductive healthcare concerns, including birth control, pregnancy testing, emergency contraception, abortion, transgender hormone therapy and testing for sexually transmitted diseases. The Website has a search bar where website users can enter terms such as "birth control" and navigate to PPFA webpages with birth control information and services.

[redacted]. Plaintiffs brought claims against Defendant under Section 631 of the California Invasion of Privacy Act ("CIPA") for Defendant's aiding and abetting of the unauthorized sharing of their private communications with PPFA.

[redacted] Instead, Defendant seeks summary judgment on: 1) whether Plaintiffs' interactions on the Website confer standing (despite Plaintiffs' direct testimony about the private searches they conducted on the Website); 2) the "in transit" element of Section 631 (despite competent evidence that third-party trackers intercepted Plaintiffs' interactions on the Website *at the same time as* PPFA received them); 3) consent (advancing the untenable argument that Plaintiffs consented to PPFA's actions simply by holding Facebook accounts); 4) Plaintiffs' evidence against trackers other than Meta; and 5) Plaintiffs' claims for injunctive relief. Defendant's motion for summary judgment raises material factual questions that should be submitted to a jury. Accordingly, the Court should deny the motion in its entirety.

## LEGAL STANDARD

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it "might affect the outcome of the suit[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. When deciding a motion for summary judgment, a court must view the evidence and draw all justifiable inferences from the underlying facts in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Summary judgment is not proper "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts[.]" *Hollingsworth Solderless Terminal Co. v. Turley,* 622 F.2d 1324, 1335 (9th Cir.1980).

## ARGUMENT

### I. Plaintiffs Suffered an Injury in Fact.

According to Defendant, Plaintiffs have no injury in fact because they cannot prove that Meta and Google linked their identities to the sensitive information they entered on Defendant's website. D's MSJ at 11. In the context of this case, identification is not required to establish standing. The interception of highly sensitive information without consent by a party with the ability and business motive to connect the information to a specific person *is* an injury in fact. However, even if actual linkage is required, summary judgment must still be denied. Meta and Google publicly admit that they link online conduct with specific users as a matter of course. In addition, they both had all the information they needed to succeed in linking Plaintiffs to their communications on the PPFA website. Together, this is competent evidence from which a jury could reasonably conclude that Google and Meta affirmatively identified Plaintiffs with their communications on the PPFA website.

**A. In the Context of This Case, Actual Identification is Not Required to Establish an Injury in Fact.**

Plaintiffs are not even required to show that they were actually identified in order to have standing. Standing analysis is not static. It is contextual. *Brown v. Google, LLC*, 685 F. Supp. 3d 909, 924 (N.D. Cal. Aug. 7, 2023).

A privacy harm may be concrete even when only anonymized data is collected. *Id.* In *Brown*, this Court denied Google's motion for summary judgment on standing, concluding that where a plaintiff "set forth specific facts demonstrating that the reason Google has access to their anonymous, aggregated data is through the collection and storage of information from users' private browsing history without consent," there is injury in fact, "*given the sensitivity of the evidence at issue*." *Id.* (emphasis added). *Brown* distinguished *I.C. v. Zynga, Inc.,* 600 F. Supp. 3d 1034, 1049 (N.D. Cal. April 29, 2022) by noting that the data at issue in *Zynga*—personal information about people who participated in social games like Words With Friends—"was not as sensitive as shown here." *Id.*

Here, as in *Brown*, the intercepted information was highly sensitive. [redacted] Ex. 1, Shafiq Report at ¶¶63, 66-67, 74-86. [redacted]

Here, like *Brown*, the sensitive information was in the hands of entities with the ability and the business motive to link it to a person. *Brown* found that "even if the individual data points gathered are anonymous by themselves, when aggregated, Google can use them to 'uniquely identify a user with a high probability of success.'" *Brown*, 685 F. Supp. 3d at 925. [redacted]

Ex. 1, Shafiq Report at ¶137. *Brown* noted that the plaintiffs set forth evidence that Google stores their data with unique identifiers. *Brown*, 685 F. Supp. 3d at 925. Here, similarly, [redacted] Ex. 1, Shafiq Report at ¶¶107-110. As further explained in Section I. B., below, Meta and Google had the means and motive to identify Plaintiffs. The specific context of *Brown* is present here: the interception without consent of highly sensitive information by an entity with the ability to link it Plaintiffs. In this context, the loss of control over private information, even without actual identification, is injury in fact. As this Court explained, in a case involving the interception of analogously sensitive data, albeit in a healthcare app rather than on a healthcare website:

> Put in terms of standing, the loss of control over one's personal information is the "concrete" harm, whether from stealing access to a personal diary in 1916 or obtaining user information in a healthcare in app in 2016. In each case, a person has lost control over her private information because of another's intentional actions.

*Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 579 (N.D. Cal. May 19, 2025).

Defendant's cited cases do not contradict this conclusion. D's MSJ at 11. They are all cases at the pleading stage where plaintiffs failed to plead *any* particulars, including what information was shared. In *Heiting v. FKA Distributing Co*., the plaintiff failed to allege *any basic facts*, "like when and how many times she visited the site, what information she provided, what information the Defendant captured, whether she was aware Defendant's tracking practices, or if she had any reason to believe that she was de-anonymized." 2025 WL 736594, at *3 (C.D. Cal. Feb. 3, 2025). *Michener v. Talkspace Network LLC* found no standing because the plaintiff failed to allege "the collection or disclosure of any of her personal information that would violate a protectable privacy interest." 2025 WL 1822801, at *8 (C.D. Cal. June 27, 2025). Likewise, in *Low v. LinkedIn Corp.*, the plaintiff failed to allege not only de-anonymization by third parties, but also "what information, precisely, these third parties have obtained." 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012). These decisions reveal nothing about how the courts would have assessed standing had the plaintiffs alleged the capture of the kind of sensitive information that Defendant shared with Google and Meta. Here, as in *Brown*, the Court should recognize that identification by an interceptor is not a necessary element

of injury in fact. Just as in *Frasco*, it is sufficient that Plaintiffs "highly personal health information was disclosed without their consent, along with data that could be used to identify individuals." *Frasco*, 349 F.R.D. at 580.

**B. Even if Actual Identification is Required, Plaintiffs Have Evidence Establishing an Injury in Fact.**

The Court should not grant summary judgment on standing even if it deems actual identification to be a requirement for an Article III injury in fact. Actual identification—actual linking of online activity to a specific person—is what Meta does. Ex. 1, Shafiq Report at ¶40; Ex. 4, Shafiq Tr. at 118:4-119:23; 121:6-122:21. [redacted] Ex. 1, Shafiq Report at ¶¶54-55, 57. [redacted] *Id.* at ¶¶29-30, 110. [redacted] *Id.* at ¶¶110-112. [redacted] *Id.* at ¶¶113-127. [redacted] Ex. 4, Shafiq Tr. at 122:2-21.

Matching is essential to Meta's business model. The purpose of tracking technologies is, in Meta's words, "to personalise content."[1] Personalizing content and anticipating a customer's future actions can only be done by connecting a customer's actions to the customer. Meta describes the Meta Pixel as a tool that "enable[s] us to match your website visitors to their respective Facebook User accounts."[2] More importantly, Meta admits that it actually does the matching as an integral

[1] *Third-Party Websites and Apps*, META PRIVACY POLICY https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.7 (last accessed March 5, 2026).

[2] *Get Started*, FACEBOOK FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last accessed on March 5, 2026).

part of the services it provides to websites that enable the Meta Pixel.[3] Meta further admits that the cookies enabled by the Meta Pixel serve the purpose of personalizing content "whether or not you have a Facebook or Instagram account or are logged in."[4]

Meta's targeted advertising business is commonly understood to be among the most successful in the U.S., if not on the planet.[5] It is preposterous to assert that Meta could deliver on its business promise of personalizing content for its customers without first matching online actions to actors. [redacted] Ex. 4, Shafiq Tr. at 118:9-119:23; 121:14-122:12.

Meta admits as much. Ex. 5, *Jancik v. WEBMD, LLC*, No. 1:22-cv-00644-TWT (N.D. Ga. June 27, 2024), ECF No. 83-4 (declaration from Meta's software engineer describing that when the Meta Pixel is triggered and collects "event" data representing users' interactions with a website, Meta matches the event data to Meta users in order "target ads on Facebook, Instagram, and publishers within Meta's Audience Network to Meta users"). [redacted], considered together with the nature of Meta's business and Meta's own statements to its customers about its business, provides a reasonable basis for a jury to conclude that actual matching occurred.

PPFA's reliance on Meta reports to try to establish that Meta never matched Plaintiffs with their actions on the PPFA website (D's MSJ at 11) overreaches. Contrary to PPFA's contention, Off Meta Activity Reports do not "track all websites to which Meta has been able to connect a user's activity." *Id.* The report provides only "a summary" of users' shared online activities and excludes "information we've received when you're not logged into Facebook, or when we can't confirm that

---

[3] *Id.*

[4] *Third-Party Websites and Apps*, META PRIVACY POLICY, https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.7 (last accessed March 5, 2026).

[5] S. Blancalfor, 5 companies have captured an insanely large share of the U.S. ad market over the last decade, FAST COMPANY, Oct. 9, 2025, https://www.fastcompany.com/91419317/big-tech-companies-us-advertising-share-growth-report (industry analyst predicts the five largest tech companies, including Meta and Google parent, Alphabet, will make up 65% of the U.S. advertising market this year, up from 22% 10 years ago) (last accessed March 5, 2026).

you've previously used Facebook on that device." Ex. 6, Review Your Activity Off Meta Technologies. These reports are no more than snapshots revealing a fraction of a Facebook user's online activities. [redacted] Ex. 7, Cohen Tr. at 219:4-9; Ex. 8, Vint Tr. at 164:2-6. [redacted] Ex. 1, Shafiq Report at ¶110. Meta's internal data is likewise incomplete. These reports are not conclusive evidence that Plaintiffs' communications were not intercepted and linked by Meta. At most, the reports create disputed issues for the jury.

The "other reasons" Defendant offers for why Meta purportedly could not have associated Plaintiffs with their activities on the PPFA website (D's MSJ at 12) merely demonstrate the array of triable issues of fact that should be submitted to a jury.

First, Defendant tries to cast doubt on whether Plaintiffs ever visited the PPFA website. *Id.* [redacted]

Defendant contends that Plaintiffs must not have been on the PPFA website because it is "impossible to use PPFA's Website" to schedule Plaintiffs' appointments. D's MSJ at 12. This is not a serious argument for two reasons. First, [redacted] A website user can begin the process of making an appointment directly on the PPFA website by supplying a zip code and the type of service sought. Ex. 11, Find a Health Center Screenshot. [redacted]

[redacted] Defendant does not contest that Plaintiffs would have been on the PPFA website to do so.

Second, Defendant claims that Meta could not have linked Plaintiffs to their intercepted interactions on the PPFA website because Plaintiffs have not shown that they used the PPFA website under circumstances that would allow the conveyance to Meta of their "Facebook account identifier." D's MSJ at 12. Plaintiffs do not have to show that circumstances were met for the conveyance of the Facebook account identifier because those circumstances do not prevent the conveyance of other identifiers. The Facebook account identifier (i.e., a c_user cookie) is not the *only* way Meta identifies account holders. [redacted] Ex. 1, Shafiq Report at ¶¶107, 110, 117.

[redacted]. *Id.* [redacted]. Ex. 4, Shafiq Tr. at 226:17-227:5. This includes the type of device, brand and model, operating system, browser type, application and file names and types.[6]

[redacted] Ex. 1, Shafiq Report at ¶¶40, 110; Ex. 4, Shafiq Tr. at 130:5-131:12. [redacted]. Ex. 1, Shafiq Report at ¶110. [redacted]

[6] *What Device You're Using, And Other Device Characteristics*, META PRIVACY POLICY, https://www.facebook.com/privacy/policy?annotations[0]=1.ex.24-WhatDeviceYoure&subpage=1.subpage.3-AppBrowserAndDevice (last accessed March 5, 2026).

[redacted]. *Id.* at ¶¶107-108, 110. [redacted]

The circumstances enumerated by Defendant (D's MSJ at 12) that are "critical factors" for the conveyance of the "Facebook account identifier" (c_user cookie) *do not matter* for the conveyance of the _fbp cookie. [redacted] Ex. 1, Shafiq Report at ¶112. [redacted] *Id.* at ¶¶107-108, 110. Accordingly, whether Plaintiffs' interactions on the PPFA website permitted Meta to identify them remains is a disputed factual matter.

Third, Defendant asserts that Meta did not actually associate Plaintiffs with their identities. D's MSJ at 13. As Plaintiffs argued in Section I. A. and B., above, if Plaintiffs are required to show that Meta actually linked Plaintiffs to their interactions with PPFA website (which they are not), Meta's ability and business necessity to do so is ample evidence from which a jury could reasonably decide that actual linkage occurred. Plaintiffs' counsel's statement to the Court that Meta does not generally do the matching reflected Plaintiffs' understanding that Meta does not *store* its data in a matched configuration; it was not, as PPFA contends (D's MSJ at 13), a concession that Meta did not connect communications from PPFA Website users to a person at the time of interception.

## II. Meta Attempted to Learn the Contents of Plaintiffs' Communications on PPFA's Website While the Communications Were in Transit.

PPFA next contends that Plaintiffs have no evidence that Meta[7] 1) read or attempted to "read" or "learn the contents or meaning" of any communication 2) while it was "in transit." D's MSJ at 14. Summary judgment is inappropriate for both prongs. With respect to the temporal "while in transit" aspect of Section 631(a), Plaintiffs have evidence that Meta acquired their communications at the same time as PPFA received them. As for whether there was an attempt to learn the meaning of any communication, Meta intentionally acquired Plaintiffs' communications during the process

[7] For simplicity, and in accordance with PPFA's motion, Plaintiffs refer to Meta in this section. However, Plaintiffs' evidence in satisfaction of this element applies equally to Google and all other trackers on PPFA's website. *See* Ex. 1, Shafiq Report ¶¶35, 43, 44, 61-63.

of transmission. A jury should decide whether the nature of that intentional interception rises to the level of an "attempt" to learn the meaning of the intercepted communication.

### A. The Timing of Meta's Interception of Plaintiffs' Communications on the PPFA Website is a Disputed Question of Fact Precluding Summary Judgment.

PPFA contends that there can only be a violation of Section 631 if Meta attempted to learn the contents of Plaintiffs' communications during "an exceptionally 'narrow window' of time—the 'milli-seconds before' a website input made by Plaintiffs' devices reached PPFA's system." *Id.* at 14 (quoting *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938 951-52 (N.D. Cal. Aug. 4, 2014)). This is not the law in California. PPFA's citation to *NovelPoster* omits the source of the embedded phrases "narrow window" and "milli-seconds before." The phrasing comes from an Eleventh Circuit decision quoting a 1997 law review article interpreting the federal Wiretap Act. *NovelPoster,* 140 F. Supp. 3d at 951-52 (citing *United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir. 2003) (quoting Jarrod J. White, *E-mail @Work.com: Employer Monitoring of Employee E-Mail,* 48 Ala. L. Rev. 1079, 1083 (1997)). Thus, this language does not reflect the Ninth Circuit's law on the "in transit" element of CIPA or the federal Wiretap Act.

CIPA's "in transit" language is broader. Under Section 631(a), liability attaches when any person:

> willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication *while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state*[.]

Cal. Penal Code § 631(a) (emphasis added). The statute is explicit that the timing of the interception may be while the communication is between parties ***or*** while it "is being sent from, or received at any place within this state." In other words, Meta—or any other third-party tracker—is liable under the plain language of CIPA when it intercepts Plaintiffs' communications *contemporaneously* with PPFA's receipt of the communication.

It is appropriate to look at cases analyzing the federal Wiretap Act to interpret the "in transit" element of CIPA Section 631(a). *Kryzek v. OpenX Techs., Inc.*, 2026 WL 206855, at *7 (N.D. Cal. Jan. 27, 2026). Importantly, the Ninth Circuit does not confine interception under the federal Wiretap

Act to "the milli-seconds before" delivery. Rather, it requires an acquisition "contemporaneous with transmission," as distinct from acquisition from electronic storage: "We therefore hold that for a website such as Konop's to be 'intercepted' in violation of the Wiretap Act, it must be acquired during transmission, not while it is in electronic storage." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002).

*Konop* is not parsing milli-seconds. It is making a distinction between communications acquired during the process of transmission (subject to the Wiretap Act) and those accessed after they have been electronically stored (subject to a lower level of protection under the Stored Communications Act). *See id.* at 878-79. *Konop* strongly suggests that milli-seconds, or even seconds, do not matter, regardless of whether they elapsed before or after delivery of the communication. The question is whether a communication is intercepted during the communicative act or after the communication ends and the message is stored. At a minimum, under both the plain statutory language of CIPA and *Konop*'s analysis of the federal Wiretap Act, an interception that happens while the communication is being received by its intended recipient is clearly covered.

That is precisely what Plaintiffs' evidence shows. [redacted]

The only evidence PPFA has adduced on this subject is muddled, at best. [redacted] Ex. 14, Vint Report at ¶143. [redacted] Ex. 8, Vint Tr. at 114:11-23. [redacted] *Id.* at 115:11-117:21. Consequently, this is not an issue for summary judgment. [redacted]

PPFA's observation that another court concluded that event data is transmitted to Meta "about 0.2 seconds ***after*** the visitor's action is transmitted to the website" (D's MSJ at 15 (citing *Doe v. Eating Recovery Center, LLC*, 2025 WL 2971090, at *5 (N.D. Cal. Oct. 17, 2025) (emphasis added by PPFA)) is irrelevant. In *Doe*, the parties agreed to those facts. *Doe*, 2025 WL 2971090, at *5. Here, Plaintiffs have not agreed that Meta receives event data after transmission to the PPFA website. As argued above, the factual record developed by Plaintiffs demonstrates a simultaneous transmission to Meta.

Finally, other district courts in the Ninth Circuit have found allegations of a simultaneous transmission to third parties as sufficient to satisfy the "in transit" element of Section 631(a). *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 838-39 (E.D. Cal. June 9, 2025). Even allegations that the interception began "within seconds" of a user reaching a website are deemed sufficient to state a claim. *Kryzek*, 2026 WL 206855, at *7. These cases align with the language of CIPA and the Ninth Circuit's focus on the distinction between acquisition during transmission and acquisition from storage. The relevant question is whether the third party acquired the contents

contemporaneously—*i.e.*, through a simultaneous duplication of the communication during the same communicative act—rather than through a subsequent interception of previously stored data. This is a question for a jury to decide, rendering summary judgment inappropriate.

**B. Whether Meta's Intentional Interception Constitutes an Attempt to Learn the Meaning of Plaintiffs' Communications is a Question That Should Go to the Jury.**

Relying on the decision in *Doe v. Eating Recovery Center*, PPFA asks the Court to decide as a matter of law that Meta's intentional interception of Plaintiffs' communications on PPFA's website does not constitute an *attempt* "to read, or to learn the contents" of those communications. D's MSJ at 15-16. The Court should not do so.

First, neither PPFA nor the opinion in *Doe* properly accounts for the distinction between reading and *attempting* to read in Section 631. It is unlawful under Section 631 when a person "reads, *or* attempts to read, or to learn the contents or meaning of any message, report, or communication." Cal. Penal Code § 631(a). PPFA's assertion that "§ 631 requires that the reading or learning occur 'while the [communication] is in transit'" (D's MSJ at 15) is blatantly inaccurate. That is not what Section 631 requires. An *attempt* to read or learn the contents while the communication is in transit is enough. Under *Doe*, a person reads or learns the contents of a communication only if they make "some effort at understanding the substantive meaning" of the communication, 2025 WL 2971090, at *5 (quoting *Williams v. DDR Media, LLC*, 757 F. Supp. 3d 989, 995 (N.D. Cal. 2024)), but *Doe* fails to give *any* independent meaning to "attempt" to read.

According to the Ninth Circuit, "attempt" is construed in accordance with its common law meaning, which is a "specific intent to engage in criminal conduct and . . . an overt act which is a substantial step towards committing the crime." *United States v. Saavedra-Velazquez*, 578 F.3d 1103, 1107 (9th Cir. 2009). From a commonsense standpoint, the interception of a communication is an essential and substantial step towards learning its content. Without the interception of communications via its tracking pixel, there would be no way for Meta to access and learn the content of those communications. A jury should be permitted to decide whether Meta's interception of Plaintiffs' communication with the intent to use the contents of those communications to craft

targeted advertising constitutes a substantial step towards unauthorized reading, and therefore an attempt to read within the meaning of CIPA.

PPFA's unsubstantiated assertion that the communications are encrypted does not change the analysis. D's MSJ at 16. PPFA contends that Meta could not attempt to read Plaintiffs' communications while they were in transit because "[t]he whole point of encryption is to make reading impossible." *Id.* The first problem with this reasoning is that encryption arguably makes it impossible for a human to "read" or "learn the content or meaning" of a communication, but there is no reason to believe that encryption makes it impossible for a tech giant like Meta to do so, even while a communication is in transit. The bigger problem for PPFA is that Plaintiffs are not required to show that Meta read or learned anything while the communications were in transit. Plaintiffs are only required to show that Meta attempted to do so. *See* Cal. Penal Code § 631(a). When attempt is construed in accordance with California law as the "specific intent to engage in criminal conduct and . . . an overt act which is a substantial step towards committing the crime" (*Saavedra-Velazquez*, 578 F.3d at 1107), encryption is irrelevant. Interception is enough.

Next, PPFA's narrow construction of the "in transit" provision conflicts with federal wiretapping law, which serves as a common guidepost for interpreting CIPA. *Kryzek*, 2026 WL 206855, at *7. The definition of "interception" under the federal Wiretap Act is "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The Ninth Circuit construes "acquisition" in accordance with its plain meaning as the "act of acquiring, or coming into possession[.]" *United States v. Smith*, 155 F.3d 1051, 1055 n.7 (9th Cir. 1998). An "acquisition" occurs when the contents of a wire communication are "captured or redirected in any way." *Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009) (quoting *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992)). If the "in transit" element of Section 631 required comprehension while in transit, CIPA would diverge significantly from its federal counterpart and provide less protection than the federal law, raising significant preemption issues. *See Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 921 (Cal. 2006) (declining to reconsider the decision in *People v. Conklin*, 522 P.2d 1049 (Cal.

1974) that CIPA is not preempted by federal law because the states are free to adopt more restrictive legislation, or no legislation, but not less restrictive legislation).

Reliance on *Doe* is unwarranted for other reasons too. Judge Chhabria cautioned that his conclusion in *Doe* was reached "without a great deal of confidence." *Doe*, 2025 WL 2971090, at *4. *Doe* also cited extensively to *Torres v. Prudential Financial*, 2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) and *Williams*, even though those cases dealt with very different technologies. The technology at issue in *Prudential* was "session replay" software with no apparent analytical component, prompting Judge Breyer to note that prior cases involving advertising trackers from Facebook and Google had different outcomes and "illustrate, CIPA remains perfectly viable in the context of internet communications." *Prudential*, 2025 WL 1135088, at *6 n.5. *Williams* involved a software that executed an "automated hashing process." 757 F. Supp. 3d at 995.

The Court should not construe Section 631 in a way that ascribes no meaning to the word "attempt," renders CIPA less protective than the federal Wiretap Act and denies the jury an opportunity to weigh the disputed facts. Accordingly, summary judgment should be denied on the "in transit" element of Section 631.

## III. PPFA Shared the Contents of Plaintiffs' Private Health Communications With Meta Without Plaintiffs' Consent.

### A. PPFA's Privacy Policy Cannot Form the Basis for Plaintiffs' Consent Because It is an Unenforceable Browsewrap Agreement and the Hyperlink to Access the Policy Was Inconspicuous.

Plaintiffs did not consent to PPFA sharing the contents of their private and sensitive communications when interacting with PPFA's Website. PPFA contends that Plaintiffs allegedly "consented to the very data collection about which they now complain" (D's MSJ at 16), but omit any discussion of how PPFA obtained consent from Plaintiffs. [redacted] That is because PPFA's privacy policy terms were contained in an unenforceable browsewrap agreement and the hyperlink to the access the policy was inconspicuously buried at the bottom of the website.

A "browsewrap" agreement is type of contract formed on the Internet where a website's terms and conditions of use are typically posted on the website via a hyperlink at the bottom of the

screen. *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014). The defining feature of a browsewrap agreement is that the user can continue to use the website or its services without accessing the page hosting the browsewrap agreement or even knowing that such a webpage exists. *Id*. (citation omitted). "Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of a browsewrap agreement depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id*. (citation omitted).

PPFA's privacy policy plainly qualifies as a browsewrap agreement. [redacted] PPFA's privacy policy's terms can only be accessed by clicking on a hyperlink buried at the bottom of the webpage amongst 20 hyperlinks, without any noticeable attributes. Ex. 16 (PPFA-Hinton_000036175 dated November 5, 2022). There is also no evidence that Plaintiffs had any reason to scroll to the bottom of the webpage when using PPFA's Website.

When a hyperlink to a website's terms (i.e., PPFA's privacy policy hyperlink) is "buried at the bottom of the page or tucked away in obscure corners of the website[,]" the Ninth Circuit has repeatedly held that website users are not on constructive notice of the terms and have refused to enforce such browsewrap agreements. *Nguyen*, 763 F.3d at 1177; *see also Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220-21 (9th Cir. 2019). The placement of a mere hyperlink at the bottom of PPFA's Website does not constitute notice or acceptance to its terms. *Nguyen*, 763 F.3d at 1178-79. This is particularly true here where the hyperlink to PPFA's privacy policy is not "readily apparent" nor would sufficiently "alert a reasonably prudent user that a clickable link exists." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). Plaintiffs' attention was not called to the existence of the hyperlink to access PPFA's privacy policy (Ex. 10, Shipley Tr. at 140:6-13; Ex. 12, Hinton Tr. at 172:1-7), and no reasonably prudent Website user would have had inquiry notice of the policy.

Accordingly, as PPFA's privacy policy constitutes an unenforceable browsewrap agreement that was inconspicuously buried at the bottom of webpage, Plaintiffs were not on inquiry or constructive notice of its terms, and thus, have not consented to them. *Nguyen*, 763 F.3d at 1178-79.

**B. Meta's Policies Do Not Sufficiently Establish Plaintiffs' Consent to Permit Meta to Acquire Sensitive Health Information from the PPFA Website.**

CIPA Section 631 prohibits any person from using electronic means to "learn the contents or meaning" of any "communication" "without consent" or in an "unauthorized manner." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) (quoting Cal. Pen. Code § 631(a)). Section 631 requires "prior consent of all parties to a communication." *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022). Consent may be express or implied, but it must be actual. *Frasco*, 349 F.R.D. at 575. For there to be actual consent, the disclosures must "explicitly notify" users of the conduct at issue. *Calhoun v. Google LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024). Further, consent "is only effective if the person alleging harm consented to the particular conduct, or substantially the same conduct, and if the alleged tortfeasor did not exceed the scope of that consent." *Id.* (internal quotations omitted). A defendant has the burden to establish the existence of consent. *Id.* (citation omitted).

Recognizing that its privacy policy constitutes an unenforceable browsewrap agreement that cannot form the basis for consent, PPFA improperly relies on Meta's policies in an effort to establish Plaintiffs' consent to have their sensitive healthcare communications with PPFA's Website intercepted and transmitted to Meta. D's MSJ at 17-18. [redacted] *Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041, at *4 (N.D. Cal. Dec. 30, 2024) (where there was no evidence

in record that plaintiffs were required to affirmatively assent to Meta policies before signing up for Facebook account, court held that defendant failed to demonstrate plaintiffs' consent to policies).

According to PPFA, Meta's January 1, 2023 privacy policy provided that Meta receives "information that advertisers, business and other partners provide to us about [users'] activity off Meta Company Products," "whether or not [the user is] logged in or ha[s] an account on our Products," and that Meta can "associate[ ]" that information with users." D's MSJ at 17, Exs. 26-27. However, courts have recognized that this "generalized notice" in Meta's policies is not sufficient to establish consent to acquire website users' sensitive health information. *See, e.g., In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022).[8] [redacted] *Id.*; *see also Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 892 (S.D. Cal. Feb. 13, 2025) (where Meta's policies informed website users that Facebook "tracks off-Facebook web activities, including those captured on third-party websites via Meta's Pixel," court found that policies did not "unambiguously" allow website operator to capture and share health information such as plaintiff's search for prescription drugs).

If a user could have plausibly understood the disclosures in question "as *not* disclosing that [the party] would engage in particular conduct," then the disclosures are not sufficient to establish consent. *Calhoun*, 113 F.4th at 1147 (emphasis in original) (citation omitted). Critically, Meta's policies governing the use of its tracking pixel clearly state that website developers are forbidden from sending Meta the exact type of user health information PPFA claims it was permitted to share. Meta's Business Tool Terms, which a website developer must agree to before creating and using a Meta Pixel ID, expressly prohibit website developers from sending user data to Meta that they "know or reasonably should know . . . includes health, financial or other categories of sensitive information

[8] PPFA's motion for summary judgment does not challenge the fact that the PPFA healthcare webpages and search terms intercepted and included in Plaintiffs' class definitions qualify as health information as well as constitute the "contents" of website users' communications with the PPFA website. *See R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024) (acknowledging that descriptive URLs and search queries can reveal user health information and constitute contents of communications under CIPA) (citations omitted).

(including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 788, 794 n.9; Ex. 17, Meta Business Tools Terms. Moreover, Meta's policies require that website developers—like PPFA—"have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use" of user data. *Id*. at 794; Ex. 17, Meta Business Tools Terms. As described above, *supra*, Section III. A., there is no evidence that PPFA itself obtained consent from its website users to collect and share sensitive healthcare information with Meta or any other third party. Accordingly, Meta's policies do not sufficiently establish Plaintiffs' consent to allow Meta to acquire their sensitive health information from the PPFA website.

### C. None of the Cases Cited by PPFA Support the Proposition that Plaintiffs Consented to PPFA Sharing Sensitive Health Information With Meta.

PPFA contends that when website users, [redacted], created and used Facebook accounts, they apparently have "no reasonable expectation of privacy" that the data generated from their visits to third-party websites will not be shared with Meta. D's MSJ at 17. However, "[c]onsent is not an all-or-nothing proposition." *L.B. v. LinkedIn Corp.*, 2025 WL 2899514, at *6 (N.D. Cal. Oct. 10, 2025) (citation omitted). [redacted] Plaintiffs still have a reasonable expectation of privacy in certain types of data, such as sensitive medical and health information. *Id*.

None of the cases cited by PPFA (D's MSJ at 17-18) support the proposition that by agreeing to Meta's policies, website users consented to PPFA sharing users' ***sensitive health information*** with Meta. In *Silver v. Stripe Inc.*, the court found that Instacart's privacy policy sufficiently disclosed that it may share certain data with its payment processing partner (Stripe) when a website user submitted an online order, but none of the challenged conduct related to sharing sensitive medical or health information. 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021). Unlike Instacart's privacy policy in *Silver*, Meta's policies explicitly state that website developers who use the Meta pixel (e.g., PPFA) are prohibited from sharing sensitive health information with Meta. Ex. 17, Meta Business Tools Terms.

Likewise, *Lloyd v. Facebook, Inc.* did not involve the collection and sharing of website users' private health or medical information. In *Lloyd*, the issue was whether Meta's policies adequately disclosed that Facebook would track website users' activities even when they were not logged into Facebook. 2022 WL 4913347, at *9-10 (N.D. Cal. Oct. 3, 2022). Similar to Meta's policies here, the data policy in *Lloyd* expressly stated that Facebook requires website developers who use the pixel "***to have lawful rights to collect, use and share your data before providing any data to us***." *Id*. at *10 (emphases added). There is no evidence—and PPFA does not contend—that PPFA itself obtained consent from website users before sharing the contents of their sensitive health and medical communications with Meta.

Finally, the *Keebaugh*, *Oberstein* and *Blizzard* cases have nothing to do with unlawful wiretapping or the dissemination of website users' medical or health information; rather, they address whether video game and ticket providers sufficiently notified website or app users to compel them to arbitration. *See Keebaugh v. Warner Bros. Entm't Inc.*, 100 F.4th 1005, 1013 (9th Cir. 2024); *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 509 (9th Cir. 2023); *B.D. v. Blizzard Entm't, Inc.*, 76 Cal. App. 5th 931, 954 (Cal. App. 2022). PPFA's reliance on those cases for the proposition that a "sign-in wrap" agreement is sufficient to put website users on inquiry notice of terms (D's MSJ at 18) is a red herring. Whether or not a sign-in wrap agreement satisfies inquiry notice to invoke arbitration does not alter the obligation under California law that "actual" consent requires disclosures to "explicitly notify" users of the conduct at issue. *Calhoun*, 113 F.4th at 1147.

[redacted]. *L.B.*, 2025 WL 2899514, at *6. Courts have often found a lack of consent when the type of data collected, such as sensitive health or medical information, albeit potentially included in a disclosure, falls outside the scope of website users' reasonable expectations. *Id.*; *see also In re Meta Pixel Healthcare Litig.*, 724 F. Supp. 3d at 794. Meta's policies would not lead a reasonable user to conclude that Meta was permitted to acquire Plaintiffs' sensitive healthcare information, especially when its pixel policies expressly

prohibit third-party website developers like PPFA from sending sensitive health information to Meta.

**IV. PPFA Is Not Entitled to Summary Judgment as to Other Third-Party Trackers.**

PPFA claims that it is entitled to summary judgment as to other third-party trackers because Plaintiffs allegedly have not adduced evidence to support standing or the merits of a CIPA claim. D's MSJ at 18-20. [redacted] Ex. 1, Shafiq Report at ¶¶54-56. [redacted] *Id*. at ¶¶29-30. [redacted] *Id.* at ¶¶113-127.

PPFA contends that Plaintiffs must show that Google linked Plaintiffs with their activities on PPFA's Website in order to have standing to pursue a CIPA claim. D's MSJ at 19. As argued in Section I. A., above, linkage is not required. However, Plaintiffs have evidence of linkage. [redacted]. *Id.* at ¶¶107-109, 113-124, 128-135. Google's own words confirm that it assigns "unique identifiers" for the intended purpose of identifying website users: "[i]n order for Google Analytics to determine which traffic belongs to which user, a unique identifier associated with each user is sent with each

hit."[9] Further, Google openly admits that it utilizes various types of website user identifying information, such as those collected via Google Analytics, to identify specific individuals for its targeted marketing business.[10]

Additionally, Google's failure to retain certain PPFA website user data from the Class Period is not affirmative proof that an unlawful interception under CIPA never occurred or that Plaintiffs were not linked to their activities on PPFA's Website. [redacted] Moreover, where "facts are unavailable to the nonmovant," Rule 56(d) gives courts discretion to deny summary judgment or "issue any other appropriate order." FED. R. CIV. P. 56(d). Google's self-serving data retention policies should not be used as a weapon in favor of summary judgment or otherwise preclude Plaintiffs from pursuing claims for PPFA's violation of their privacy rights.

Finally, PPFA argues that the interception of communications while "in transit" component of a CIPA claim requires a "detailed factual analysis of the precise mechanisms by which each company's analytics technology works[.]" D's MSJ at 19. [redacted] Accordingly, summary judgment is not warranted on the issue of whether third-party trackers intercepted Plaintiffs' communications with the PPFA website while they were in transit.

---

9 *How Users are Identified for User Metrics*, GOOGLE, https://support.google.com/analytics/answer/2992042?hl=en (last accessed March 5, 2026).

10 *Advertising,* GOOGLE, https://policies.google.com/technologies/ads (last accessed March 5, 2026).

**V. Plaintiffs Have Standing to Pursue Injunctive Relief.**

To establish standing for prospective injunctive relief, a plaintiff must demonstrate "a sufficient likelihood that [s]he will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Generally, standing for injunctive relief is satisfied where there is a "real and immediate threat of repeated injury" in the future. *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011). Although past wrongs are insufficient by themselves to grant standing, they constitute "evidence bearing on whether there is a real and immediate threat of repeated injury." *Lyons*, 461 U.S. at 102 (citation omitted).

PPFA argues that Plaintiffs cannot pursue injunctive relief because they do not have evidence of any future threat of harm. D's MSJ at 20-21. The evidence, however, shows that PPFA continues to aid and abet the interception of PPFA website users' private communications by third parties via the use of tracking pixels subjecting Plaintiffs to a "real and immediate threat of repeated injury." *Lyons*, 461 U.S. at 102. PPFA's privacy policy confirms that PPFA continues to employ Google Analytics and other tracking technologies on its Website that "automatically collect information about how you access the Services on our Sites, read our emails, or otherwise engage with us."[11] In CIPA cases, courts have recognized that where the alleged unlawful practices are ongoing and the defendant retains the intercepted data without consent, there is a "real and immediate threat of repeated injury" sufficient to confer standing to pursue injunctive relief. *See, e.g., D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1194 (S.D. Cal. 2024); *Matera v. Google Inc.*, 2016 WL 5339806, at *18-19 (N.D. Cal. Sept. 23, 2016).

[redacted]

[11] *Privacy Notice*, PLANNED PARENTHOOD, https://www.plannedparenthood.org/privacy-policy#disclosure (last accessed March 5, 2026).

[redacted] Thus, she is subject to a "likelihood of future injury" sufficient to establish standing to seek injunctive relief. *Matera*, 2016 WL 5339806, at *15.

Finally, PPFA's implementation of a cookie banner on its Website in March 2024 (D's MSJ at 21) does not automatically constitute actual consent or eliminate the threat of future injury. [redacted] Ex. 7, Cohen Tr. at 323:3-20. Further, PPFA has not proffered any evidence indicating whether the cookie banner was populated for all Website users, where it was displayed on the Website or how it was displayed. While the cookie banner purportedly stated that "third[-party] partners use cookies and other tools to collect, store, monitor, and analyze information about your interaction with our site to improve performance, analyze your use of our sites and assist in our marketing efforts[,]"[12] this disclosure would not lead a reasonable website user to conclude that third-parties were permitted to acquire private and sensitive healthcare information. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 793. Accordingly, absent an injunction, Plaintiffs and other website users face a "real and immediate threat of repeated injury" from PPFA's continued unlawful data harvesting.

**CONCLUSION**

Defendant seeks summary judgment on issues that should either be decided for Plaintiffs as a matter of law or raise genuine issues of material fact that should be submitted to a jury. Plaintiffs respectfully request that the Court deny Defendant's motion in its entirety.

Dated: March 5, 2026

Respectfully submitted,

By: *<u>/s/ Jamie A. Robinson</u>*

Klint L. Bruno (admitted pro hac vice)
Michael L. Silverman (admitted pro hac vice)
Jamie A. Robinson (admitted pro hac vice)
Adam J. Feuer (admitted pro hac vice)
**THE BRUNO LAW FIRM, LLC**

[12] Ex. 18, PPFA Responses and Objections to Plaintiffs' Second Set of Interrogatories, Response No. 13.

By: */s/ Bradley A. Benbrook*

Bradley A. Benbrook
Stephen M. Duvernay
**BENBROOK LAW GROUP, PC**

*Attorneys for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing document was filed this 5th day of March 2026 via the electronic filing system of the Northern District of California, which will automatically serve all counsel of record.

*/s/ Jamie A. Robinson*
Jamie A. Robinson